THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* THOMAS LEVAN, Appellant.

Argued October 23, 1945; decided November 29, 1945.

*Rudolph Stand, Irving Mendelson, Lucius L. Delany* and *Louis Wendel* for appellant. I. The trial court committed prejudicial error in refusing to permit the defendant to testify directly as to his intent and motive in visiting the home of the deceased on the night of the homicide. (*Kerrains* v. *People,* 60 N. Y. 221; 1 Wharton on Criminal Evidence [10th ed.], § 24; *Thurston* v. *Cornell,* 38 N. Y. 281; *McKown* v. *Hunter,* 30 N. Y. 625; *Noonan* v. *Luther,* 206 N. Y. 105; *State* v. *Wright,* 40 La. An. 589; *State* v. *Hall,* 132 N. C. 1094; *People* v. *Smith,* 172 N. Y. 210; 2 Wigmore on Evidence [3d ed.], § 581; Underhill on Criminal Evidence [4th ed.], § 138.) II. The prosecutor's summation transcended the bounds of proper argument and was prejudicial to the appellant's rights. (*People* v. *Fielding,* 158 N. Y. 542; *People* v. *Manganaro,* 218 N. Y. 9; *People* v. *Esposito,* 224 N. Y. 370; *People* v. *Mull,* 167 N. Y. 247.)

*Frank S. Hogan*, District Attorney (*Whitman Knapp* and *Richard G. Denzer* of counsel), for respondent. I. The defendant's guilt was proved beyond a reasonable doubt. II. The trial court did not improperly limit the defendant's testimony. III. The alleged errors in the prosecutor's summation do not warrant disturbing the judgment. Conceding that defendant's army status should not have been alluded to, it can hardly be said, particularly in the light of the court's instructions, that the incident involved anything approaching reversible error. (*Horowitz* v. *United States*, 262 F. 48.) IV. None of the remarks on summation now challenged — viewed in the light of the innocuous character of most of them, of the closing address as a whole, of the court's rulings and instructions and of the reaction of defense counsel — can be deemed of the sort affecting the judgment. (*People* v. *Sexton*, 187 N. Y. 495; *People* v. *Slover*, 232 N. Y. 264; *People* v. *Cummins*, 209 N. Y. 283; *People* v. *Conklin*, 175 N. Y. 333; *People* v. *Doody*, 172 N. Y. 165; *People* v. *Wolf*, 183 N. Y. 464; *People* v. *Mull*, 167 N. Y. 247.)

LEWIS, J. On April 9, 1944, at 12:25 A.M., Joseph Dawkins, returning from his night-shift employment, entered his apartment at 419 West 128th Street, New York City. There he discovered the dead body of his wife, Anna Dawkins, lying on the kitchen floor. The defendant, Thomas Levan, stands convicted of murder in the first degree upon a finding by a jury that the death of Anna Dawkins was accomplished by him while he was engaged in the commission of a felony. (Penal Law, § 1044, subd. 2.) The jury made no recommendation of life imprisonment under section 1045-a of the Penal Law.

The defendant did not deny the fact that he killed Anna Dawkins. Nor is it denied that after the killing he took with him from the Dawkins apartment several bottles of whiskey, a number of items of jewelry and at least $27 in currency which belonged to the decedent.

The theory of the prosecution was that the killing of Anna Dawkins was the act of the defendant committed while he was engaged in the commission of a robbery. The defendant, testifying in his own behalf, claimed that the decedent's death was accidental. His demand for a reversal of the judgment of death

and for a new trial rests upon alleged errors at the trial which he claims prejudiced his rights before the jury.

From evidence adduced by the prosecution it appears that Joseph Dawkins, the victim's husband, became acquainted with the defendant in the summer of 1943 while both were employed in a factory at Edgewater, New Jersey. They worked together until December, 1943, when the defendant was inducted into the armed forces. Prior to his induction the defendant had been a frequent visitor at the Dawkins' apartment. There had been occasions when Dawkins had driven the defendant to and from their work. The defendant had borrowed small sums of money from Dawkins, which loans were repaid. There had been dice games in which Dawkins had participated with the defendant and their friends. When the defendant had been in the army only a short time he telephoned Dawkins asking for a loan of $8. Dawkins promptly wired the money to the defendant at Camp Devens, Massachusetts. Two days later he saw the defendant in New York City and from that time until Saturday night, April 8, 1944 — the night of the homicide — Dawkins saw the defendant every day.

On that Saturday night, a few minutes before midnight, Dawkins left his place of employment accompanied by five co-employees and proceeded by automobile to his home. Arriving there at about 12:25 A.M. of the following day — April 9th — his companions remained in the parked car while he mounted the stairs to his third floor apartment to obtain a bottle of whiskey which he was to share with them. As he entered his apartment Dawkins noticed that lights were turned on in all the rooms except the kitchen. He went first to his bedroom where he had left four bottles of whiskey. They were missing. He then proceeded through the apartment and found beds " torn up " in both bedrooms. As he entered the hall near the kitchen he saw the body of his wife lying on the kitchen floor with her head immersed face down in a pot of water. After lifting her head from the water he ran downstairs to his companions who returned with him to the apartment. He then called the police.

From testimony given by the deputy chief medical examiner for the city of New York it appears that the death of Anna Dawkins had occurred at least two hours and not more than seven hours prior to his arrival at 2:45 A.M. of April 9th. The cause

of death was found to be " traumatic asphyxia " — a combination of strangulation and the immersion of the victim's head. Except for the presence on the floor of the body and an aluminum pot partially filled with water there was no disorder in the kitchen which gave evidence of a previous disturbance. When the medical examiner turned the body over blood was exposed on the floor and a cut over the decedent's left eye was noticed. A subsequent search of the apartment revealed that currency, various articles of jewelry and other items of personal property were missing.

No clue was found which pointed to a solution of the crime until a week after its occurrence when Dawkins met the defendant in front of a theatre on 125th Street. At that time Dawkins noticed a scratch on the defendant's left cheek. He inquired as to the cause of the scratch and was told by the defendant that it had been received in " a fight " with a woman. His suspicion being aroused Dawkins left at once to summon the police. Upon his return with a police officer the defendant had disappeared. Then followed a search of the neighborhood which led to a house at 122 West 127th Street where the defendant was rooming and where it was disclosed that on the occasion of his arrival on the night of Saturday, April 8th, he had displayed two bundles containing four quarts of liquor and a quantity of jewelry. There was also evidence of an occasion when a woman who was sharing a room with the defendant was overheard warning him to " keep quiet, Big Jim [Dawkins] is looking for you ". On another occasion the defendant had told a tenant in the rooming house that if anyone should ask if a soldier was staying there she should deny it. When the tenant expressed curiosity the defendant explained — " The woman that I fought with is dead." Further inquiry by the tenant as to whether he had killed a woman brought forth from the defendant the answer — " No, I didn't kill the woman but the man killed the woman that was with me." These suspicious circumstances caused the defendant's arrest. His indictment and trial followed.

The People's case rests chiefly upon oral and written confessions by the defendant in the first of which he implicated an acquaintance, " Arthur Jones ", as the guilty party. On the day following his first oral statement he was told that his finger

prints had been identified on an aluminum pot found at the scene of the crime. Upon being so informed the defendant gave a second version of the killing in which he said that on the night it occurred he hâd been on his way to the Dawkins' apartment and had " heard Mrs. Dawkins screaming." Upon entering the apartment he saw " Arthur Jones sticking her head in this pot of water." He told Jones not to do that and then " went over and picked up the pot." His third version of the crime was given shortly thereafter. From that statement and from one recorded by a stenographer and given by him subsequently in response to questions by an assistant district attorney, it appears that on the night of the homicide he went alone to the Dawkins' apartment and was admitted by Mrs. Dawkins. After telling her he was trying to locate her brother, who was a sergeant in the army, he asked her to lend him $20 which she refused to do stating that he already owed her that amount. Later, at his request, she went into the kitchen to prepare refreshments for him. While there, when she again refused to lend him money, they " started wrestling ". In the affray which followed she scratched his face and he in turn choked her and struck her four or five times with a blackjack which he had taken from his pocket. When she fell to the floor he filled a pot with water and, in an effort to revive her, he " picked her head up, and he kept putting it in and out of the water until she stopped bubbling." He then left his victim on the floor and went through the apartment from which he took $27 or $28 in cash, several bottles of whiskey, various articles of jewelry, the decedent's keys and a camera. With only minor variations this version of the crime was in accord with the defendant's own testimony when he took the witness stand to give the only evidence produced in his defense. From his recital it appeared that while Mrs. Dawkins and he were " teasing each other " she not only refused to lend him $20 but she made a persistent effort to collect the debt he already owed her by trying to extract money from his " back pocket ". It is the defendant's claim that he resisted that effort and that in the melee which followed he drew his blackjack and dealt blows upon her head which prostrated her. After he sensed what he had done, according to his own testimony, the following occurred — " And I said, ' I done killed this woman '. And

I started out. I said, ' I done killed her. I might as well go ahead on and take something.' I started rambling through the house, and took some jewelry and some other stuff. And I took the keys.''

The record at hand thus gives evidence of a degree of moral depravity which has led to a shocking crime. But if we are to deal with such behavior according to applicable forms of law — '' A criminal, however shocking his crime, is not to answer for it with forfeiture of life or liberty till tried and convicted in conformity with law ''. (*People* v. *Moran,* 246 N. Y. 100, 106.) In this instance we find prejudicial error at the trial which deprived the defendant of substantial rights and requires reversal of the judgment of death and a new trial.

On direct examination the defendant was asked by his counsel — '' Q. When you went up to see Anna Dawkins that night, did you intend to go up there to steal money from her? A. No, sir, I didn't intend — Mr. Herman [the assistant district attorney]: I object to the question, your Honor. The Court: Sustained. Mr. Mendelson: Respectfully except.''

Thereafter defense counsel persisted, without success, in his effort to introduce into evidence testimony by the defendant showing his intent in going to the Dawkins' residence — as appears from the following excerpt: '' Q. Tommy, what was your intention when you went up to the Dawkins' home on — A. My intention — Mr. Herman: Objection. Mr. Mendelson: Wait a minute. May I finish the question, your Honor? Q. — Saturday night or Sunday morning? Mr. Herman: Objection, your Honor. The Court: Sustained. Mr. Mendelson: I respectfully except. Q. What did you go up there for, Tommy? Mr. Herman: I object to that. The Court: That is the same thing in another form, isn't it? Sustained. Mr. Mendelson: I respectfully except.''

The District Attorney, with commendable frankness, states in his brief — '' We believe the court might well have permitted the defendant to answer these questions.'' He takes the position, however, that the error was harmless because the jury might have inferred from evidence already in the case that the defendant's intent in going to the Dawkins' apartment was not to commit a robbery.

We cannot extenuate the error, as suggested by the District Attorney. There was no denial by the defendant, prior to the ruling, of an intent to rob. He did not have to depend upon inferences from the evidence to establish that his intention was not robbery. The trial court had already indicated that the jury would be called upon to determine whether the defendant was guilty of a felony murder. The case presented by the prosecution had proceeded upon the theory that when the killing of Anna Dawkins occurred at the hands of the defendant he was engaged in the commission of a felony — viz., *a robbery.* (Penal Law, § 1044, subd. 2.) In such circumstances this court has had occasion to rule that — " Generally speaking murder in the first or second degree connotes the specific or particular intent to kill, while manslaughter in the first or second degree is felonious homicide when the intent to kill is absent. But when one engaged in the commission of a felony, *his mind being fatally bent on mischief* but without a design to effect death, kills a human being, at common law, the killing is said to be with malice aforethought and so murder, and the Penal Law attaches to the act the consequences of murder in the first degree  *  *  * the gist of robbery is larceny by force from the person (Penal Law, §§ 2120, 2122), and  *  *  * the gist of larceny is the taking and carrying away of personal property of another *with the specific intent to steal* such property (Penal Law, § 1290). If on an indictment for larceny or robbery the testimony leaves uncertain *the intent* with which the accused took the property, the jury should be instructed to give the defendant the benefit of the doubt." (*People* v. *Koerber,* 244 N. Y. 147, 152, 153–154.) (Emphasis supplied.)

Again it has been said that " Whenever intent becomes material, its quality or persistence — the deranging influence of fear or sudden impulse or feebleness of mind or will — is matter for the jury if such emotions or disabilities can conceivably have affected the thought or purpose of the actor." (*People* v. *Moran, supra,* p. 103. See, also, *People* v. *Roper,* 259 N. Y. 170, 176–177; *People* v. *Cummings,* 274 N. Y. 336, 337.) In the present case the defendant's intention when he entered the Dawkins apartment may well have been a vital issue before the jury in the determination of the extent and degree of his crime. Long ago the courts of this State recognized the principle that

" * * * when the motive of a witness in performing a particular act, or making a particular declaration, becomes a material issue in a cause, or reflects important light upon such issue, he may himself be sworn in regard to it, notwithstanding the difficulty of furnishing contradictory evidence, and notwithstanding the diminished credit to which his testimony may be entitled as coming from the mouth of an interested witness." (*Kerrains* v. *People of the State of N. Y.*, 60 N. Y. 221, 229. See also, *Noonan* v. *Luther*, 206 N. Y. 105, 107–108; *Thurston* v. *Cornell*, 38 N. Y. 281, 287; 2 Wigmore on Evidence [3d ed.], § 581.) Testimony by the defendant as to what his intent was would not have been conclusive but it was competent. (*Noonan* v. *Luther, supra*, p. 108.) To borrow from language already quoted from *People* v. *Koerber* (*supra*, p. 152) — it was within the defendant's legal rights, in view of the case presented by the prosecution, to state to the jury whether, when he sought and obtained admission to the Dawkins home, " * * * *his mind* [was then] *fatally bent on mischief* but without a design to effect death * * * *".* (Emphasis supplied.) (See Wharton on Criminal Evidence [11th ed.], Vol. I, § 315; Vol. III, § 1207.)

As the error to which we have referred leads to a reversal and a new trial, we direct attention — as a counsel of caution — to an incident which occurred just before the case was submitted to the jury and which may well have prejudiced the defendant's right to a fair trial. An excerpt from that portion of the record taken during the summation by the Assistant District Attorney shows the following: " Mr. Herman [the assistant district attorney]: Now, this defendant appears here in this court room in an Army uniform. I don't suppose the fact that he wears this uniform means a thing, as far as any effect on your judgment, gentlemen. But bear in mind that he shouldn't have been here at all. There are many men wearing this uniform and doing their duty in other parts of the world beside Harlem and New York City — Mr. Stand: That is objected to. We object to that statement as being grossly improper, as injecting into this case a matter which is highly inflammatory and distinctly a collateral issue. The Court: Well, the evidence in the case is that this defendant, a few days before New Years, left Camp Devens without a furlough, where he had been inducted in the

Army of the United States, and came to New York. And he remained in New York without reporting back to duty until — has never, as a matter of fact, reported back for duty by reason of his arrest in this case around the 16th of April. Disregard the other statement about other soldiers being on the other side. He was absent without leave, or he was a deserter — I don't know which — but he was not in the Army from a few days before New Years, and has never been in the Army since, although he was inducted there. And he was not on furlough at the time he came to New York. That is in the evidence, isn't it? Mr. Stand: That is correct, your Honor; but no effort should be made to unduly prejudice the jury against the defendant because of those facts.''

There was thus injected into the case an issue which did not relate itself to the crime for which the defendant was being tried. In *Viereck* v. *United States* (318 U. S. 236), the Supreme Court of the United States has recently had occasion to condemn similar improprieties. There the prosecuting attorney in his summation had suggested to the jury that they had a duty to perform arising from the fact that the nation was then at war — a fact entirely unrelated to the issue on trial. The court, per Mr. Chief Justice STONE, said (pp. 247–248):

'' As the case must be remanded to the district court for further proceedings, we direct attention to conduct of the prosecuting attorney which we think prejudiced petitioner's right to a fair trial, and which independently of the error for which we reverse might well have placed the judgment of conviction in jeopardy. In his closing remarks to the jury he indulged in an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice. The trial judge overruled, as coming too late, petitioner's objection first made in the course of the court's charge to the jury.

'' At a time when passion and prejudice are heightened by emotions stirred by our participation in a great war, we do not doubt that these remarks addressed to the jury were highly prejudicial, and that they were offensive to the dignity and good order with which all proceedings in court should be conducted. We think that the trial judge should have stopped counsel's discourse without waiting for an objection. ' The

United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' *Berger* v. *United States,* 295 U. S. 78, 88. Compare *New York Central R. Co.* v. *Johnson,* 279 U. S. 310, 316–18.''

It should be said that in the case now before us the jury was told by the court '' * * * you are not going to convict this defendant because there are other men on the other side being shot, or serving their country. You are not to convict him on that theory at all.'' We cannot say, however, with assurance that the jury did disregard the clear implications from the emphasis placed by the prosecuting attorney upon the damning fact that the defendant had absented himself without leave from his military duties in a time of war. The virus thus implanted in the minds of the jury is not so easily extracted.

The judgment of conviction should be reversed and a new trial ordered.

LOUGHRAN, Ch. J., CONWAY, DESMOND, THACHER and DYE, JJ., concur; MEDALIE, J., taking no part.

Judgment of conviction reversed, etc.