**UNITED STATES of America**

v.

**Ray NEDLEY, Stanley Jochim, and Paul Baurhenn, Appellants.**

Nos. 12366–12368.

United States Court of Appeals
Third Circuit.

Argued Jan. 20, 1958.

Decided May 14, 1958.

Ben Paul Jubelirer, Pittsburgh, Pa., for appellants.

Hubert I. Teitelbaum, U. S. Atty., Pittsburgh, Pa. (D. Malcolm Anderson, U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, KALODNER, Circuit Judge, and WRIGHT, District Judge.

KALODNER, Circuit Judge.

Has the Hobbs Act[1] raised hob with centuries-old concepts of the crime of "robbery" to such extent that to establish its commission the Government need no longer prove (1) a specific intent to steal and to permanently deprive the owner or possessor of his property; (2) a "taking" and (3) a "carrying away"?

Otherwise stated: Is mere unlawful interference, by force, violence and/or putting in fear, with the dominion and

---

1. 18 U.S.C. § 1951, 62 Stat. 793:

"§ 1951. Interference with commerce by threats or violence.

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

"(1) The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining."

control being exercised by the operator of a vehicle, with resulting obstruction or delay in the movement of articles or commodities in interstate commerce, "robbery" or an "attempt at robbery" under the Hobbs Act?

The District Court took the affirmative side with respect to the foregoing;[2] the Government did so below and does so here; the defendants, perforce vigorously and understandably so, disagree, since they were found guilty and sentenced for violation under the robbery provisions of the Hobbs Act.[3]

■ Viewing the evidence in the light most favorable to the Government, as the jury's verdict required, the facts are as follows:

On August 4, 1955, George Moore and Perry Honaker were operating a tractor-trailer from St. Louis, Missouri, to Pittsburgh, Pennsylvania. The tractor was owned independently by Moore; Honaker acted as his helper. The trailer, owned by Refrigerated Food Distributor, contained merchandise for Gimbels Department Store in Pittsburgh.

Moore parked his truck off the highway near a gasoline station on Route 8 in Shaler Township, Allegheny County, Pennsylvania at around 6:30 p. m. and walked to an adjacent restaurant with Honaker. According to Moore, while they were there, Nedley, one of the defendants, questioned him about his destination and told him he would be unable to unload in Pittsburgh because of a general freight strike and that he should turn around and go back; Moore and Honaker left the restaurant and walked to the parked truck; Nedley at that time threatened to "hammer" them up and put them out of business if they moved the truck; the defendants Jochim, Baurhenn and Ciancio were present when the threat was made.

Moore phoned the Shaler Township Police and asked for protection; the police arrived at around 7:30 p. m. and after dispersing the striking truckers, who then numbered five, escorted the tractor-trailer to the Millvale Borough Line; Nedley and Jochim followed the truck in a Buick automobile driven by Ronnie Kanoza, now deceased; Baurhenn and Ciancio joined them in a Pontiac automobile driven by Ciancio; Moore's vehicle struck the Buick when it blocked his attempt to go through a busy intersection in Millvale; after the collision Jochim ran to the truck, jumped on the running board and struck Moore in the face through an open window; Moore grabbed a wrecking bar about eighteen or twenty inches long and opened the cab door, knocking Jochim from the running board; as Moore emerged from the tractor someone standing on the gas tank between the cab and the trailer jumped on him; Moore was disarmed by Nedley in the struggle and never struck anyone with the bar; however, he hit a couple of the defendants with his fists; Jochim knocked him down, one of them "stomped" him and put him "out of business"; Honaker was struck by one of the defendants while he was in the cab; he got out of the truck and struck one of the defendants, later identified as Nedley, on the back of the head with a tire iron; Hona-

---

2. D.C.W.D.Pa.1957, 153 F.Supp. 887.

3. The defendants actually premise their appeals on these grounds: (1), there is no evidence in the record that they had any unlawful intent to commit or attempt to commit, robbery within the purview of Section 1951, and (2) the District Court did not instruct the jury as to the mens rea necessary to sustain the offense of robbery.

The first contention was appropriately presented to the District Court via motion for judgment of acquittal or in the alternative for a new trial. As to the second contention: the defendants did not submit a written point for charge nor did they request any such instruction at the conclusion of the charge; further, they failed to raise the matter in their alternative motion and only presented the point for the first time at the oral argument on such motion. Defendants urge that the point can be raised here because the error complained of was so substantial as to constitute basic and prejudicial error.

ker was injured in the leg when one of the defendants secured the tire iron and threw it at him as he ran to a nearby gasoline station.

With respect to the foregoing, the defendants, members of a striking teamsters union, vigorously denied the use of threats at the restaurant; Nedley stated that he merely exchanged union cards with Moore and asked him not to cross their picket lines; that he and the other defendants had been assigned picket duty at nearby freight terminals where union agreements had not been signed; the meeting with Moore and Honaker at the gasoline station on Route 8 was accidental; that the collision with Moore's truck in Millvale occurred as his car started through a green light; Jochim walked over to the truck; Moore attacked him with the wrecking bar and struck him in the face and arms as he attempted to ward off his blows; Nedley finally succeeded in disarming Moore; Nedley was then struck from behind and they all fell to the ground in the struggle; Ciancio and Baurhenn arrived during the melee and Baurhenn apparently joined in it.

The record further discloses that the police appeared on the scene shortly thereafter and immediately put an end to the Donnybrook fair. Moore and Honaker, along with Jochim and Nedley, were taken to the Millvale jail after receiving emergency treatment at a nearby hospital. The other defendants were taken directly to jail. All were charged with disorderly conduct in the Borough of Millvale. Moore and Honaker were released the following day and proceeded with the delivery of their cargo to Gimbels Department Store without further interruption.

The four defendants were indicted on two counts for violation of the Hobbs Act and a third count charging violation of the Conspiracy Act, 18 U.S.C. § 371.

The first count charged the defendants with violation of the Hobbs Act in that they "did attempt to obstruct and delay commerce * * * by robbery of the tractor and trailer, then and there in the possession of George R. Moore; to wit, by attempting to deprive the said possessor of said tractor and trailer of the power to exercise dominion and control over same by means of force and violence and causing him to fear injury to his person and to the property in his possession or custody; and specifically, by oral threat at Jess' Restaurant, on Pennsylvania Route No. 8 near Etna, Allegheny County, Pennsylvania, and by further threats and force and violence on or near East Ohio Street in Millvale, Allegheny County, Pennsylvania."

The second count charged the defendants with violation of the Hobbs Act in that they "in furtherance of a plan and purpose to obstruct and delay commerce and the movement of articles and commodities which were being transported in commerce * * *" committed the acts charged in the first count both as to Moore and his helper, Honaker.

The third count charged the defendants "did conspire together and with each other * * * to obstruct and delay commerce, and the movement of certain articles and commodities which were being transported in commerce * * * by robbery of the tractor and trailer * * *" by committing the acts charged in the first two counts, and that "in furtherance of said conspiracy to obstruct and delay commerce as aforesaid [the defendants] * * * did assault, strike and injure George R. Moore and Perry Melvin Honaker * * *"

Prior to the court's charge to the jury the Government, at a side-bar conference anent defendants' motion for judgment of acquittal, agreed that the evidence had to sustain a finding that there must have been a robbery or an attempt to commit robbery as defined by the Hobbs Act, or a conspiracy to do so, and the case went to the jury on that theory.

The jury verdicts were as follows: Jochim and Nedley guilty on all three counts; Ciancio not guilty on all three counts; Baurhenn not guilty on the first and second counts but guilty on the third —the conspiracy count. As earlier stated, Kanoza, a participant in the events

leading up to the fight, died shortly after the incident and consequently was not indicted. Jochim and Nedley were sentenced to pay a $1 fine on each of the three counts and to terms of imprisonment of fourteen months on count one, fourteen months on count two, and one year on count three. The sentences were to run concurrently. Baurhenn was fined $1 and committed to custody for a period of one year on the conspiracy count.

The District Court in its opinion, at 153 F.Supp. 887 (1957), denying the defendants' motion for judgment of acquittal or in the alternative for a new trial, stated at pp. 891, 892:

"* * * the indictments upon which the convictions are predicated appear loosely drawn by *confining the offense of attempt to obstruct and delay commerce to the single element of 'robbery of the tractor and trailer.'*

"To give legal credence to the convictions, therefore, it will be necessary to establish the offense of robbery as defined in the statute [the Hobbs Act].

\* \* \* \* \* \*

"* * * I * * * believe that a *deprivation of possession by placing in fear and resort to physical force and violence for a period however brief is sufficient to complete the offense of robbery.*

\* \* \* \* \* \*

"* * * the definition of robbery as defined by Congress is not the common law definition. *The statute does not impose the absolute requirement of a taking since the Act provides also for 'obtaining.' Nor does it require an asportation or that the perpetrator must intend to permanently deprive the owner or possessor of his property. The na-*

*ture of the force or threats is considerably broader than the common law provisions.*

\* \* \* \* \* \*

"I am satisfied that the jury could have concluded, under the broad purview of the statute, that the *overt acts, threats and violence on the part of defendants constituted robbery, more particularly, depriving the persons in possession of dominion and control over the vehicle and cargo.* \* \* \*". (Emphasis supplied.)

On these appeals the Government rather curiously disregards the District Court's view that the defendants' conduct "constituted robbery" but categorizes it instead as "an attempt to commit robbery".[4]

The hard core of the Government's position here, as already indicated, amounts to this: Interference, by force and violence with one's lawful dominion and control of a vehicle, with resulting obstruction in interstate commerce, without more, constitutes robbery or attempted robbery under the Hobbs Act; in the statutory definition of robbery there is no requirement of a "taking" or attempted "taking" of the vehicle or its contents or of the asportation of either vehicle or its contents.

Thus, the Government contends, when the defendants threatened violence at the restaurant in Shaler Township should Moore and Honaker attempt to proceed with their tractor-trailer to Pittsburgh, the defendants' conduct amounted to attempted robbery under the Hobbs Act, and the same was true with respect to the episode in Millvale where the free-for-all ensued, because there the defendants by actual violence deprived Moore and Honaker "of possession, dominion and control" of their vehicle.[5]

---

4. At page 6 of the Government's brief it is stated: "Thus, we are now presented with a narrow question: whether or not the conduct of the defendants amounted to *an attempt to commit robbery*".

Again, at page 7 it is stated: "The real question presented is whether the

against the background in which they [the acts done under the circumstances and defendants] did then constitute *an attempt to commit robbery as defined*". (Emphasis supplied.)

5. The Government also urges that there was a further attempt at robbery by

The decisional law is replete with extortion prosecutions under the Hobbs Act, but, prior to this case, no court has had the robbery provision before it for consideration. The extensive legislative history of the Act[6] which, it might be noted parenthetically the District Court did not consider, is particularly helpful in defining the precise scope of the statutory interdiction.

In House debate on the bill, Representative Hobbs, its sponsor, stated "there is nothing clearer than the definition of robbery and extortion in this bill. *They have been construed by the Courts not once, but a thousand times.* The definitions in this bill are copied from the New York Code substantially."[7] To the same effect are Representative Walter's statements "that [the] definition [in the Act] is the definition of robbery contained in the New York Code",[8] and Representative Michener's statement that "there has been and will be so much talk about what constituted robbery and extortion and it is well to remember that the New York definitions are being used in this bill."[9]

■ It is doubtful that legislative intent could be more clearly spelled out. That being so, we are required to look to the New York Penal Laws relating to robbery and the construction given them by the New York courts.[10]

■ Section 2120 of the New York Penal Law defines robbery as "the unlawful taking of personal property, from the person or in the presence of another, against his will, by means of force, or violence, or fear of injury, immediate or future, to his person or property * * ."

Section 2121 of the New York Penal Law provides: "To constitute robbery, the force or fear must be employed either to *obtain or retain* possession of the property or to overcome resistance to the taking. * * * "

It will be noted that in Section 2120 the term used is "taking" while Section 2121 uses "obtain".

The Courts of New York in construing the State's statutory definition of robbery have made no distinction between "taking" and "obtaining".

Further, while neither Sections 2120 and 2121 specify any requirement of "intent" or "asportation" or "carrying away", the New York courts have ruled that they are elements of robbery and must be established in order for a conviction to stand.

The foregoing was succinctly spelled out in People v. Koerber, 1926, 244 N.Y. 147, 153, 154, 155 N.E. 79, 82, as follows:

"* * * we find that the gist of robbery is larceny by force from the

reason of the fact, that, according to its testimony, one of the defendants, during the episode at Millvale, opened or attempted to open a vent door on the front of the trailer, some three-quarters distance from its bottom. The vent door, according to the testimony, was "just a small door"; "a sort of air hole" which was used as a means of ingress for ice when the trailer carried a cargo of produce. It is conceded that the vent door was so small as to make impossible a man's entry through it. The Government, nevertheless, argues that that fact is "immaterial". We disagree. The vent door incident could under no stretch of the imagination sustain a verdict of attempted robbery and the Government's assertion of it does little credit to the Government.

6. 91 Cong.Rec. 11839–11848, 11899–11922 (1945).

7. Id. at 11900. N.Y.Penal Law, McKinney's Consol.Laws, c. 40, § 2120 defines robbery as "the unlawful taking of personal property, from the person or in the presence of another, against his will, by means of force, or violence, or fear of injury, immediate or future, to his person or property, or the person or property of a relative or member of his family, or of anyone in his company at the time of the robbery."

8. 91 Cong.Rec. 11842 (1945).

9. Id. at 11843. See also Rep. Russell's statement at p. 11914.

10. United States v. Turley, 1957, 352 U.S. 407, 413, 77 S.Ct. 397, 400, 1 L.Ed.2d 430: "It is, therefore, appropriate to consider the purpose of the Act and to gain what light we can from its legislative history."

person (Penal Law, §§ 2120, 2122), and that the gist of larceny is the *taking* and *carrying away* of personal property of another with the *specific intent to steal* such property (Penal Law, § 1290). If on an indictment for larceny or robbery the *testimony leaves uncertain the intent* with which the accused took the property, *the jury should be instructed to give the defendant the benefit of the doubt * * * That* the intent is usually to be inferred from the act *does not change the rule that a taking without intent to steal is not larceny at common law.* * * *

"*Robbery,* as thus defined, is '*a particular species * * * of crime*' of which '*the actual existence of any particular * * * intent is a necessary element*' within the meaning of Penal Law, § 1220." (Emphasis supplied.)

See also People v. Levan, 1945, 295 N.Y. 26, 64 N.E.2d 341 in which People v. Koerber, supra, was cited with approval.

That there must be an intention to "keep wrongfully", that which has been stolen, was held in Irving Trust Co. v. Leff, 1930, 253 N.Y. 359, 364, 171 N.E. 569, 571. It was there said:

"To steal means to *take away from one* in lawful possession without right with the *intention* to *keep wrongfully.*" (Emphasis supplied.)

The construction by New York courts of their state's statutory definition of robbery is in complete accord with settled construction of common law robbery.

■ Robbery, at common law, is "the *felonious* and forcible *taking* from the person of another of goods or money to any value by violence or putting him in fear." 4 Bl.Com. 241. The very gravamen of robbery is the felonious intent—animus furandi—the intention to steal.

In Commonwealth v. White, 1890, 133 Pa. 182 at page 188, 19 A. 350, Mr. Chief Justice Paxson tersely pinpointed the necessity of the existence of felonious intent with this statement:

"If it was not done with a felonious intent, it was not robbery. * * * *"

In United States v. Cohen, 3 Cir., 1921, 274 F. 596, 597 we defined the statutory offense of stealing an interstate shipment to be the "unlawful taking and carrying away with intent to convert to the use of the taker and permanently deprive the owner."

In United States v. Kemble, 3 Cir., 1952, 197 F.2d 316, 321 we reversed because the trial judge had failed to adequately charge the jury with respect to animus furandi "of a specific intent to steal".

The Government vigorously urges that robbery, as defined by the Hobbs Act "varies from the requirements of common law robbery" and that "there is no absolute requirement of a 'taking' * * * since the act also interdicts the 'obtaining' ". It must be noted that in doing so it is merely echoing the District Court's statement, earlier quoted, that "The statute does not impose the absolute requirement of a taking since the Act also provides for 'obtaining' ". [153 F.Supp. 891.] As to that contention it need only be said, as earlier pointed out, that Section 2120 of the New York Penal Laws used the term "taking" while Section 2121 used "obtain or retain" and the courts of that state have never made any distinction between them. In this connection it may be observed that the predecessor to the present Hobbs Act (48 Stats. 979, 980), proscribed the conduct of one who "obtains or attempts to obtain" money by threat, force, coercion, etc.[11]

We cannot subscribe to the proposition that Congress intended by the inclusion of the word "obtain" to scrap centuries-old concepts of the elements of a felony such as robbery and to obliterate requirements of "taking" and "carrying away".

11. See comparison of the present Hobbs Act with the predecessor statute at 91 Cong. Rec. 11901 (1945).

The same holds true with respect to "specific intent to steal" and to "permanently deprive" the owner or possessor of his property.

■ As the Supreme Court of the United States so pertinently observed in Morissette v. United States, 1952, 342 U.S. 246 at page 263, 72 S.Ct. 240, at page 249, 96 L.Ed. 288:

"The Government asks us by a feat of construction radically to change the weights and balances in the scales of justice. The purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction, to strip the defendant of such benefit as he derived at common law from innocence of evil purpose, and to circumscribe the freedom heretofore allowed juries. Such a manifest impairment of the immunities of the individual should not be extended to common-law crimes on judicial initiative.

"*The spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute. And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind* unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." (Emphasis supplied.)

■ To the same effect see United States v. Turley, 1957, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430. It was there said (352 U.S. at page 411, 77 S.Ct. at page 399):

"We recognize that where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning."

It would be flogging a dead horse to extend discussion of the Government's untenable position. It is enough to say that the Government does not even venture an assertion that there is in the record an iota of evidence to even indicate, let alone establish, any specific intent on the part of the defendants "to steal" and "to take away—with the intention to keep wrongfully" the tractor-trailer.

The Government has chosen to premise its case against the defendants on its view that, as the District Court stated, "* * * the definition of robbery as defined by Congress is not the common law definition", and that obstruction of interstate commerce by threats, force or violence is "robbery" or "attempt to commit robbery" within the meaning of the term "robbery" as used in the Hobbs Act. [153 F.Supp. 891.]

We disagree with the view of the Government and that of the District Court.

■ "Robbery" under the Hobbs Act, is common law robbery, and robbery as defined by the New York Penal Laws and construed by the courts of that State. In order to establish commission of the crime the Government must prove forcible taking and carrying away with the specific intent to steal personal property taken from the person of another by violence or putting in fear, and with the intention to permanently keep the property so taken.

■ The most the Government proved in this case was (1) threats of violence by the defendants at the roadside restaurant in Shaler Township should the tractor-trailer attempt to proceed to Pittsburgh, (2) an attempt by the de-

fendants to harass and impede the movement of the tractor-trailer at Millvale while on its way to Pittsburgh by "cutting-in" in front of it and "dragging", and (3) a free-for-all fight when the tractor-trailer struck the defendants' Buick which was "cutting-in".[12]

To categorize any or all of these events as "robbery" is to make a mockery of the term. Assuming that there was inexcusable unlawful interference both at the restaurant in Shaler Township and in Millvale, with the dominion and control being exercised by the operators of the tractor-trailer, with resulting violence, there was no "taking" of the vehicle, forcible or otherwise, nor was there evidence of intent to steal. As was so well said in People v. Flack, 1891, 125 N.Y. 324, 334, 26 N.E. 267, 270, 11 L.R.A. 807, cited with approval in Morissette v. United States, supra, 342 U.S. at page 274, 72 S.Ct. at page 255:

> "It is alike the general rule of law, and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act, but a criminal intention."

12. The cases of Le Fanti v. United States, 3 Cir., 1919, 259 F. 460, and United States v. De Normand, 2 Cir., 1945, 149 F.2d 622, relied on by the District Court and the Government are inapposite.

In Le Fanti the defendant was indicted for receiving stolen goods. Two boys who had stolen a bale of silk in interstate commerce took it to Le Fanti's saloon—a "fence". He told them his place was being watched and directed them to take the stolen bale "to the dumps" and that he would follow them in his car. He did so and then gave explicit directions to the boys where to drop the bale. He then returned to his saloon where he was placed under arrest. The court held that Le Fanti had attained "possession" of the stolen bale, when, at his direction, the boys had placed it at the place designated by him as an act of transfer.

In De Normand the defendants conspired to hi-jack two trucks containing liquor which were parked outside of a terminal by their drivers while they were having a bite at a nearby restaurant. On their

For the reasons stated the judgment of conviction and sentence as to the defendants will be reversed and the cause remanded to the District Court with direction to enter a judgment of acquittal.[13]

return to the trucks the drivers were held-up at gun point by the defendants, forced to open the doors of the terminal, gagged and bound and left in an empty truck. The defendants then walked away from the terminal and were placed under arrest and indicted for stealing goods in interstate commerce. In the meantime a confederate had driven away one of the liquor trucks to a designated "drop". The court held that under the circumstances attending their seizure of the two truck drivers they had acquired constructive possession of their trucks.

13. In view of our disposition we have not been required to pass upon defendants' second point relating to the District Court's error in failing to give adequate instructions to the jury on the score of "intent". The record clearly sustains the defendants' second point and the District Court's error was basic and prejudicial. See Morissette v. United States, 1952, 342 U.S. 246, 274, 72 S.Ct. 240, 96 L.Ed. 288; United States v. Kemble, 3 Cir., 1952, 197 F.2d 316, 322.