HAROLD KIMBLE v. THE STATE OF ARKANSAS

5-5401                                    438 S.W. 2d 705

Opinion Delivered March 24, 1969

*Phillip Carroll* for appellant.

*Joe Purcell,* Atty. Gen. and *Don Langston,* Asst. Atty. Gen. for appellee.

CARLETON HARRIS, Chief Justice.    On June 27, 1967, appellant, Harold Kimble, was tried by the Circuit Court of Pulaski County (First Division) sitting as a jury, convicted of the crime of assault with intent to kill, and sentenced to five years in the penitentiary.    He remained in the penitentiary until May 16, 1968, when the conviction was set aside by the court after a hearing under a Criminal Procedure Rule 1 petition. The court found that, at the original trial, no witnesses were called on appellant's behalf, though Kimble had furnished his then attorney with the names of four or five persons, who appellant stated would testify to the effect that he was acting in self-defense.    Appellant was again tried on June 12, 1968, by a jury, again found guilty, and the verdict fixed his punishment at nine years' imprison-

ment in the penitentiary. From the judgment entered in accord with this verdict, Kimble brings this appeal. For reversal, five points are urged, as follows:

I. *The Arkansas jury selection system and its application by the Commissioners in this instance deprived the defendant of a fair cross-section of the community to pass judgment on his life and liberty.*

II. *Appellant's confession was taken in violation of his constitutional rights and should not have been admitted in evidence.*

III. *Admissible evidence on an important issue was wrongfully excluded by the Court.*

IV. *The Trial Judge wrongfully expressed his opinion of defendant's guilt in the presence of the jury.*

V. *Appellant's period of confinement should be reduced by the period of confinement under the former void conviction.*

We proceed to a discussion of these contentions in the order listed.

## I.

It is forcefully argued that the composition of the jury panel precluded Kimble from being tried by a jury of his peers. The argument is directed, not particularly to the fact that there was discrimination against members of the Negro race, but a discrimination occasioned by the selection of a particular group of persons, rather than a cross-section of the entire community. There were six Negroes on the jury panel, and actually four of these were selected as members of the twelve-person jury which convicted Kimble. As expressed by appellant, the jury commissioners picked the "blue ribbon" class of jurors, *i.e.*, businessmen, school principles, teachers, etc., and completely ignored day laborers, me-

chanics, and other wage earners.    In other words, it is
the contention of appellant that he was deprived of a
jury composed of his economic and social peers.

Appellant's attack is made upon the system of se-
lection of jury panels, and he says that it is only natural
that jury commissioners will select persons for jury·
service composed· of their neighbors, friends, acquaint-
ances, *i.e.*, persons that they know, and the selection of
businessmen for jury commissioners, necessarily means
that the same members·of that classification only will be
selected for jury service.    It is pointed out ·that the
three jury commissioners were respectively the owner
of· an exclusive men's ·store, an owner and operator of
several florist shops in Little Rock, and the assistant
controller of a dairy.    Five of the six Negro personnel
selected for jury service were school (high school or col-
lege) personnel, and the other was a self-employed sign
painter.    Appellant states:

> "* * * The ·Commissioners cannot really be
> blamed when the panel is unconstitutionally consti-
> tuted, for it is inherent in the system that they will
> choose· their ·neighbors, friends, ·acquaintances, or
> persons who have reputations as substantial citi-
> zens in the community."

The attack is actually on the Arkansas statutes[1] pro-
viding for the selection of jurors, which appellant says
violates his rights under the Fifth, Sixth, and Four-
teenth Amendments to the United States Constitution.
The case of *Thiel* v. *Southern Pacific Company,* 328 U.S.
217, is cited by appellant, but we do not agree that this
case affords support to appellant's position.    There,
the. court pointed out that the American tradition of
trial by jury necessarily contemplates an impartial jury,
drawn from a cross-section of the community.    The
court, however, stated:·

[1]Ark. Stat. Ann. § 39-201, § 39-205, § 39-208, and § 39-215 (Repl.
1962).

"\* \* \* This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups."

The court reversed the judgment because wage earners were systematically and ordinarily excluded, but, in *Thiel,* the court made this pertinent finding:

"The undisputed evidence in this case demonstrates a failure to abide by the proper rules and principles of jury selection. Both the clerk of the court and the jury commissioner testified that they deliberately and intentionally excluded from the jury lists all persons who work for a daily wage."

In the case before us, all jury commissioners testified; it is true that one testified that he partly took into consideration whether the selection of certain jurors would cause a hardship, but the panel was picked by all three commissioners, and there is no evidence that the other two considered possible inconvenience to any particular group. It certainly cannot be said that the jury was made up of owners or heads of businesses for the record reflects that employees heavily predominated the composition of the panel; nor was there any evidence that prior jury panels had been limited to any particular class of persons. There is no showing, nor it is argued, that there was any systematic exclusion of any group, racial, economic, social or religious.

As far as the statutory method of selecting jurors is concerned, this is the responsibility of the General Assembly, and not of this court. The United States Supreme Court has never declared this method of selection to be violative of any constitutional requirement,

and until that is done, it is our view that any change can only properly be consummated by legislative act.

## II.

We do not agree that appellant's confession was taken in violation of his constitutional rights. It is first mentioned that the Little Rock Municipal Court was in session in the same building in which Kimble was questioned by two Little Rock detectives on February 17, and it is argued that appellant should have been taken to the chambers of the Municipal Judge so that the prisoner's rights could be properly protected. The fact that the court was in session at the time does not, in our view, strengthen appellant's case, for certainly a judge, with a set docket of cases to be heard, would not have been expected to adjourn court, and proceed to chambers with the officers and Kimble. We have made it clear, on numerous occasions, that the failure to take an arrested person before a Magistrate does not vitiate his confession. In *Paschal* v. *State,* 243 Ark. 329 (1967), 420 S.W. 2d 73, we said:

> "Counsel for the appellant, citing *McNabb* v. *United States,* 318 U.S. 332 (1943), insist that the confession was inadmissible because Paschal had not been taken before a magistrate for commitment, as the statute requires. Ark. Stat. Ann. § 43-601. The McNabb case, however, involved the interpretation of federal statutes that do not apply to the states. *State* v. *Browning,* 206 Ark. 791, 178 S.W. 2d 77 (1944). Under our statute the failure to take an arrested person before a magistrate does not vitiate a confession, because the statute is construed to be directory only. *State* v. *Browning, supra; Moore* v. *State,* 229 Ark. 335, 315 S.W. 2d 907 (1958).

The important consideration is whether Kimble was advised of his constitutional rights, and whether the procedure followed was in line with the United States Supreme Court decision in *Miranda* v. *Arizona,* 384 U.S.

436. Before this statement was introduced, the court went into chambers with counsel for the purpose of holding a hearing on the question of whether the statement was voluntarily made. Detective Bob Moore of the Little Rock Police Department testified that he first talked with Kimble about 8:30 A.M. on the morning after appellant's arrest. The detective stated that he and officer Pete Evans advised Kimble that he had the right to remain silent; the right to talk with an attorney before giving a statement; the right to have an attorney present when answering any questions; that any statement that he gave would be used in a court of law, and that, if he waived these rights, he had the right to stop the interrogation at any time. He then gave Kimble a waiver to read and sign, and testified that he did not make any promises or threats to induce appellant to make a statement. Kimble signed the waiver, and the officer said that appellant was very cooperative in telling about the shooting. Moore stated that he wrote the statement as Kimble related the facts. Appellant said that he started giving the statement when first brought to the jail, then went to sleep, and finished giving it the next morning. He said that he gave the statement, stopping at times to give Moore an opportunity to write what was said. He added that he initialed it in places at the request of the officer, but he really did not know whether the officer wrote everything, word for word, that he said. He never did answer the question as to whether he read it over before signing it. The court held that the statement was voluntarily made, and the weight of the evidence appears to be to that effect. The officer testified emphatically that the *Miranda* warnings were given, that Kimble waived his right to an attorney at that time, and voluntarily made the statement. Appellant answered, "No," to his attorney's question relative to whether he had had an opportunity to confer with a lawyer, but, though represented at the second trial by able and competent counsel, he never did state that he was not offered an attorney, nor did he deny that he was told he had the

right to remain silent. He only said that he was confused and upset. There is no contention of threats, force, or duress. Actually, the statement does not conflict with appellant's defense at the trial, since Kimble pleaded self-defense, and the court instructed the jury on self-defense. In his statement, Kimble said that he was accosted by Columbus Collins (victim of the shooting), who was quite belligerent, and that he shot Collins after the latter started toward him with his hand in his pocket.[2] Kimble's testimony at the trial, with reference to the shooting, reiterated that the shooting was in self-defense; that Collins came toward appellant with his hand in his pocket, and Kimble pulled out his pistol and shot Collins. In describing the shooting, the only difference was that on trial, Kimble stated that he fired the first shot in the air, and fired the second shot at Collins. Appellant said that he only fired twice. In his statement, he did not mention firing the first shot in the air, and said, "I think I shot three times." We hold that the statement was voluntarily made, after Kimble had been advised of his constitutional rights, heretofore enumerated.

## III.

Collins was only struck by one bullet. Appellant says that the most important issue in the case was whether he had the intent to kill when pulling the trigger. He was asked the question by his attorney, "If you had wanted to, would you have had any difficulty in shooting him more than once?" The state objected to the question on the basis that it called for a conclusion

---

[2]Collins testified in an unusual manner for a prosecuting witness, in that he admitted having his hand in his pocket: "I have my hand in my pocket all the time. I've got in trouble in the Army about that. I walk down the road with my hands in my pocket, or with one hand in my pocket. I do that all the time, and I have got in trouble about that. * * * I have change in my pocket and I just play with it, just running the change through my fingers. * * * When I went outside I had one hand in my pocket. I always keep one hand in my pocket, I always keep it that way."

on the part of the witness, and this objection was sustained.

Of course, the question did call for a conclusion, inasmuch as Kimble was saying that any shots fired would have struck Collins, and this would seem problematical, since according to Kimble's own testimony, Collins turned and fled down an alley after the second shot. However, we agree that appellant had the right to testify as to his intention when he shot Collins, but we find no prejudicial error in the court's ruling. It appears that the point that he was trying to get over to the jury was that he had bullets left in his pistol, and could have fired them had he wanted to. He had already testified that he did not aim the first shot at Collins, and had already testified that he did not want to kill his victim. From the record:

"I fired directly in the air to get him to stop running his hand in his pocket. I didn't want to hurt him, and I didn't want him to hurt me."

Also, when asked if he had the gun in his pocket when the incident arose in the shine parlor, and if he "pulled" the gun, appellant answered:

"No, I didn't. I didn't want any trouble. *I could have shot him then,* but I tried to get away from him. I tried to withdraw from him so there wouldn't be any trouble, and then he followed me outside. After he came up to the front, *I could have shot him then if I had wanted to. I could have shot him then when we came from the back to the front,*[3] but I withdrew from him again and tried to avoid all that, but he kept pressing and kept pressing, and then he ran his hand in his pocket, and I warned him not to put his hand in his pocket. and he kept on, and that is when I shot him, and

_____
[3]All italicized statements in this paragraph denote our emphasis.

Andrew Carey hollered to him that I had a gun, and told him to run * * *."

He said that "when he ran down the alley, I put my gun back in my pocket, and there was no more shots fired, just those two shots."

After the court ruled the question improper, Kimble testified in chambers that he had four more bullets in his pistol, but he didn't fire them, because he "was just trying to stop him from doing something to me, and that is just why I shot him one time." After Kimble returned to the witness stand, the record reveals the following:

"Q.  (Mr. Carroll, continuing) You testified you fired two shots, and the first one did not strike Mr. Collins, but the second one did. After you fired those two shots, did you fire any additional shots?

A.  No, sir, not after I fired those two shots. After I fired those two shots, I put my gun back in my pocket.

Q.  Did you have any more bullets left in your revolver after those two shots?

A.  Yes, sir, I had four.

Q.  And you did not fire them?

A.  No, sir."

It is difficult to see, from these quoted portions of the transcript, how appellant could have conveyed more clearly to the jury that he had no desire to kill Collins; that he was only trying to scare his adversary from making an attack on him (appellant), and that he had plenty of ammunition in his pistol to continue firing if he desired to do so.

## IV.

During the closing argument to the jury, counsel for appellant asked the jury to take into consideration the fact that Kimble had already served four hundred and seventy-nine days in jail, and in the penitentiary. The court instructed the jury that it could not take this into consideration, stating:

"The man was tried in this Court and this Court thought he was guilty and sentenced him to the Penitentiary. He later was brought in under Rule I, a new rule of the Supreme Court, because of the fact that certain witnesses weren't called in his behalf and, for that reason, I set the judgment aside so he could have the opportunity to get these witnesses in that he wanted to testify, and, also, to try it before a jury if he liked."

Appellant argues that the court's statement that it "thought he was guilty" (at the first trial) was a prejudicial comment made in the presence of the jury, and calls for a reversal. We do not discuss this asserted error for the reason that no motion for a mistrial was made; nor, for that matter, was any objection made or exception saved. See *Randall* v. *State,* 239 Ark. 312, 389 S.W. 2d 229.

## V.

The record reflects that Kimble was in jail one hundred and twenty-five days before the first trial. After the first conviction was set aside, he was returned from the penitentiary, and placed in the county jail until making bond twenty-six days later. He also apparently served a total of three hundred and thirty days in the penitentiary between the time of the first conviction and the order setting the same aside.

Appellant argues that he should have been given credit on the present sentence for this amount of time.

As to the days served in jail, we do not agree, for we have no statute permitting this to be done. It is not shown why appellant did not make bond before the first trial; certainly, the alleged offense was bailable, and, as mentioned, bond was made subsequent to the prisoner's being returned to the jail after the judgment was vacated. As to the time served in the penitentiary, we think appellant is due to have deducted the number of days served after the first conviction. Ark. Stat. Ann. §§ 43-2726 through 43-2728 (Repl. 1964) deals with the confinement of a prisoner in the penitentiary where an appeal is taken, and the judgment reversed by the Supreme Court. The first two sections set out that upon a reversal, if a new trial is ordered, the defendant shall be removed from the penitentiary back to the county jail. Ark. Stat. Ann. § 43-2728 provides that, if a defendant, upon a new trial, "is again convicted, the period of his former confinement in the penitentiary shall be deducted by the court from the period of confinement fixed in the last verdict of conviction."

The state argues that these statutes have no application to a situation where the trial court itself sets aside the first conviction, and appellant is, accordingly, not entitled to this relief. The state is technically correct in that the statutes refer to a reversal by the Supreme Court, but we do not think the General Assembly particularly intended a distinction between convictions reversed by the Supreme Court, and convictions vacated by the Circuit Court. Rather, the only logical conclusion is that the General Assembly intended for a convicted person who obtained a new trial, and was again convicted, to receive credit for the amount of time already served for the same offense.

The record reveals that Kimble received a fair trial, and was found guilty by the jury. We find no reversible error, and the cause is remanded to the Pulaski County Circuit Court, First Division, with instructions to amend the judgment, crediting the second sentence of

appellant with the amount of time served for this offense in the state penitentiary between the first and second convictions.

It is so ordered.

BROWN and FOGLEMAN, JJ., dissent.

JOHN A. FOGLEMAN, Justice.    I agree with the majority opinion in every particular except one. That has to do with appellant's Point III.    I do not agree that excluding the testimony of appellant with reference to his intention on the occasion of the alleged offense was not prejudicial.    In order that the matter be put in proper perspective, I deem it necessary to refer to a portion of the record not mentioned in the majority opinion.

After the court's ruling on the original question propounded by appellant's attorney, he asked to be permitted to make a record on his proffer of proof in chambers.    Thereupon, the judge, the defendant, and counsel for the state and defendant's attorney retired to chambers, where the following occurred:

Q.    (by Mr. Carroll)    Mr. Kimball, if you had wanted to shoot Columbus Collins more than once, was there anything that would have prevented you from doing so?

A.    No, sir, there wasn't.

Q.    Why didn't you shoot him more than once?

MR. ROBINSON:

Objection.    That calls for a conclusion.

THE COURT:

You can move to strike it after he is through testifying.

A. I didn't shoot no more than just the one time, because, in the first place, I didn't want to have any quarrel with him. I didn't want to shoot him. In the first place, I didn't want to shoot him, and I was just trying to stop him from doing something to me, and that is just why I shot him one time.

Q. Now, after you shot this first shot, that did not strike him, and did he keep coming?

A. I fired the first shot in the air. I shot a warning shot, and he made a couple more steps, and I hollered at him not to open up on me, and then I shot him.

Q. Did he have his hands in his pocket?

A. He had his hand in his pocket at that time.

Q. Did you have any more bullets in your gun after you shot him?

A. Yes, sir, four more.

MR. CARROLL:

Your Honor, I want to offer that evidence to the jury.

MR. ROBINSON:

It is repetitive and conclusionary. It is not proper redirect anyway. This has nothing to do with what I went into on cross examination. I don't think it is proper.

THE COURT:

I don't think it is. The other witness testified four or five shots were fired, and this man said he shot some in the air.

MR. CARROLL:

One, Your Honor.

THE COURT:

One shot in the air, and the other witness said he heard three or four while running away from him. It is up to the jury to decide whether or not he wanted to kill him. The jury has to conclude that from the evidence before them, not by what he says he had in mind at the time.

MR. CARROLL:

He knows better than anybody else.

THE COURT:

That's right, but it is up to the jury to decide from the evidence.

MR. CARROLL:

Note my exceptions to the ruling of the Court. Now, specifically, I want to ask him back on the stand if there were any bullets left in his gun.

THE COURT:

You may do that. That is admissible and you may do that.

(THEREUPON, the Court, the defendant and counsel for the State and the defendant returned to the courtroom and the following proceedings occurred:)

The point that appellant was trying to get over to the jury was not that he had bullets left in his pistol; rather, it was that he had no intention to kill Collins, the critical point in the trial. Thus by refusing the appellant's offer of proof, he was deprived of his right to state categorically why he did not shoot more than once. It can well be imagined that an aggressive and alert prosecuting attorney might make a vigorous argu-

ment that the jury should draw the inference from the testimony that appellant did intend to kill Collins because, even though appellant elected to take the witness stand, he never stated his own intentions or state of mind.

I think that prejudice is clearly demonstrated and is not removed by reason of the fact that the appellant may have stated that he did not want to hurt Collins when he fired the shot into the air. Nor is it sufficient that he stated that he could have shot Collins, if he had wanted to, after Collins came up to the front or when he and Collins came from the back to the front. Nor is it sufficient that appellant testified that he put his gun back in his pocket and fired no more shots when Collins ran down the alley. The proffered testimony had to do with direct statements of his intentions at the time that he fired the shot which struck Collins and thereafter. This was the real issue in the case.

I think that the proper rule to be applied by us is that it is prejudicial error to exclude direct testimony of an accused as to his intent, motive, reason or beliefs whenever that intention, motive, reason or belief is an essential element of the crime or is an issue in the case —particularly when the only other evidence on that element relates to acts from which the intention of the accused can only be inferred. See *Cummins* v. *United States*, 232 F. 844 (8th Cir. 1916); 22A C.J.S. Criminal Law § 647; 29 Am. Jur. 2d 413, Evidence 364; *Miller* v. *State*, 230 Ark. 352, 322 S.W. 2d 685.

While the authorities cited above have not been determined on the basis of prejudice, or lack thereof, there is a clear inference in *Cummins* v. *United States,* supra, that the exclusion of a question calling for a direct statement of intent by the defendant is prejudicial unless questions of substantially the same character and of the same full import had been answered. It seems to me that the great weight of authority would support that position.

In *People* v. *Levan,* 295 N.Y. 26, 64 N.E. 2d 341 (1945), the state took the position that there was harmless error in excluding a direct statement by a defendant in a murder case as to his intention because the jury might have inferred from evidence already in the case that the defendant's intent was not to commit a robbery, in the course of which the victim was killed. There the court held that when a defendant would otherwise have to depend upon inferences from the evidence to establish his lack of the essential intention, it was not harmless error to exclude his direct denial of the requisite intent.

In *Cain* v. *State,* 112 Ga. App. 646, 145 S.E. 2d 773 (1965), the appellant was charged with larceny of an automobile. The evidence showed that the defendant had taken the vehicle, driven it from Carrollton to Atlanta and back. Even though he had testified that he was returning the car to the place from which he had stolen it when the police apprehended him, refusal to permit him to state whether it had been his intention not to return it and to state what he would have done with the car if he had not been apprehended was held reversible error. The court held the error prejudicial in spite of the fact that it stated that the evidence strongly indicated that he intended to return the automobile to the place from which it had been taken and that there was no intent permanently to deprive the owner of it.

In *Smith* v. *State,* 38 Okla. Cr. 416, 262 P. 507 (1928), it was said:

> "It is well established that a defendant charged with a crime which has as one of its ingredients an unlawful intent may explain his intent and mental purpose, and may deny the specific intent required to constitute the offense. Wigmore § 581, says, with the exception of Alabama, the rule is absolute in the United States. See *Snow* v. *State,* 3 Okl. Cr. 291, 105 P. 572 [575]; *Cosby* v. *State,* [30 Okl. Cr.

294,] 236 P. 51; 8 R.C.L. § 174, p. 181, authorities cited.''

In *Haigler* v. *United States,* 172 F. 2d 986 (10th Cir. 1949), reversible error was found in the sustaining of objections to testimony by one charged with violation of the income tax laws concerning his understanding of the law applicable to his income tax liability on the grounds that his intent would be judged by his acts and not by what he understood to be their consequences. This result was reached in spite of the fact that the appellant was permitted, indirectly, to adduce the theory of his defense by stating what he had told the investigators in explanation of his acts.

I would reverse and remand this case for a new trial.

BROWN, J., joins in this dissent.