UNITED STATES of America, Plaintiff–Appellee,

v.

David Milton THOMAS, Lisa Reese, William Bide Shelton, and Terry Wayne Giddeons, Defendants–Appellants.

UNITED STATES of America, Plaintiff–Appellee,

v.

Johnny REESE, Defendant–Appellant.

Nos. 91–8859, 91–8885.

United States Court of Appeals, Eleventh Circuit.

Nov. 22, 1993.

John R. Francisco, Macon, GA, for Thomas.

Randall Russell, Macon, GA, for Reese.

Christina Hunt, Macon, GA, for Giddeons.

Floyd M. Buford, Jr., Buford & Buford, Macon, GA, for Johnny Reese.

Gregory Burr Macaulay, Washington, DC, for William Bide Shelton.

G.F. Peterman, III, Asst. U.S. Atty., Macon, GA, for U.S.

Before KRAVITCH and BLACK, Circuit Judges, and DYER, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Appellants Johnny Reese, Lisa Reese, William Bide Shelton, David Milton Thomas and Terry Wayne Giddeons appeal their convictions under the Hobbs Act, 18 U.S.C. § 1951. Giddeons and Shelton also appeal their sentences.[1] The convictions arose out of an alleged scheme by appellants to rob a bank and to dynamite the sheriff's office in Danielsville, Georgia. Appellants raise a variety of issues, including the sufficiency of the evidence, deficiencies in the jury instructions, prosecutorial misconduct and error in calculating their sentences. For the reasons stated below, we reverse the convictions of Johnny Reese and Lisa Reese, and affirm the convictions and sentences of Giddeons, Thomas and Shelton.

## I.

On March 4, 1991, at approximately 1:00 a.m., Thomas and Giddeons visited the home of Tina Bryant and her husband Tim.[2] Thomas and Giddeons revealed to the Bryants that they planned to rob the Bank of Danielsville on March 7. They stated that Thomas, Giddeons, Shelton and a fourth unidentified individual were involved in the conspiracy. One of the participants would throw dynamite into the sheriff's office to prevent a response to the bank alarm, which was connected to the sheriff's office, while the others, using guns Thomas and Giddeons planned to steal, would commit the robbery. The getaway would be accomplished in Giddeons'

car. A few hours later, Thomas and Giddeons returned to the Bryants' house and again discussed the scheme.

Tina Bryant went to the sheriff's office in Danielsville and told the authorities of her conversations with Thomas and Giddeons. The next day, Bryant met with Federal Bureau of Investigation (FBI) and other law enforcement officials and agreed to tape-record conversations concerning the planned robbery.

On March 5, Shelton, Johnny Reese, Lisa Reese, Tina Colston and Colston's child, drove into Danielsville in Giddeons' car. The car broke down in the center of town, behind the hardware store and near the Bank of Danielsville. Lisa Reese, Colston and Colston's child went into the bank for approximately three minutes. As they were leaving, Shelton briefly entered the bank and then ushered them out. The group of five then walked to the nearby Golden Pantry convenience store, where Bryant worked. Bryant asked Shelton if the plan to rob the bank was true. Shelton stated that it was and he discussed details of the plan with her, in the presence of the others. That evening the Reeses left Danielsville to return to their home in Woodstock, Georgia.

On March 6, Bryant had two further conversations with Thomas and one with Shelton, in which the planned bank robbery again was discussed. Appellants were arrested later that evening. No physical evidence resulted from searches of Shelton's residence and Giddeons' father's home, where Giddeons and Thomas were staying.

Six defendants—Colston, Johnny Reese, Lisa Reese, Giddeons, Thomas and Shelton—were indicted on a single count of conspiracy to rob a federally insured bank in violation of the Hobbs Act. Colston and Shelton were granted a separate trial. At the first trial, all the defendants, Lisa Reese, Johnny Reese, Thomas and Giddeons, were found guilty. At the second, Colston was acquitted and Shelton was convicted. This appeal followed.

---

1. Although Johnny Reese's appeal was severed from that of the other appellants, we consolidate the cases for the purpose of this opinion.

2. Tina Bryant is a first cousin of Thomas and a step-sister of Shelton.

## II.

■ The claim of insufficient evidence is raised by Johnny Reese, Lisa Reese, Thomas and Shelton. The sufficiency of the evidence is a question of law that is reviewed de novo. *United States v. Kelly*, 888 F.2d 732, 739 (11th Cir.1989). In reviewing this claim we examine the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt ... [as a] jury is free to choose among reasonable constructions of the evidence." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[3] The reversal of a conviction for insufficient evidence is warranted only if no reasonable jury could find proof of guilt beyond a reasonable doubt. *United States v. Jones*, 913 F.2d 1552, 1557 (11th Cir.1990). Nevertheless, there must be sufficient evidence to support all necessary elements of the crime. We noted in *Jones* that:

> [t]o support a conviction for conspiracy, the government must prove ... that two or more persons agreed to commit a crime, that the defendant knew of the conspiratorial goal, and that he voluntarily participated in helping to accomplish that goal.

*Id.* (citation omitted). Keeping in mind the standard of review for claims of insufficient evidence and the elements that must be proven for conspiracy we examine appellants' individual claims.

**3.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), the Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981.

**4.** At the close of the government case, Johnny Reese moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(a). After the motion was denied, Reese rested his case without presenting any evidence. As such, we consider his claim of insufficient evidence looking only to the evidence presented during the government's case-in-chief. *United States v. Thomas*, 987 F.2d 697, 702 (11th Cir.1993); *United States v. Reme*, 738 F.2d 1156, 1161 (11th Cir.1984), *cert. denied*, 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985); *United States v. Belt*, 574 F.2d 1234, 1236–37 (5th Cir.1978).

*Johnny Reese*

■ The evidence introduced at trial against Johnny Reese is insufficient to support his conviction.[4] The case presented against Johnny Reese amounted to no more than a demonstration of "mere presence" with those involved in the conspiracy. Proof of association with the conspirators is one factor that can be considered as evidence of a defendant's participation in a conspiracy. *United States v. Garate–Vergara*, 942 F.2d 1543, 1547 (11th Cir.1991), *cert. denied*, ── U.S. ──, 112 S.Ct. 1212, 117 L.Ed.2d 451 (1992). Presence with conspirators alone, however, or close association with them, is not by itself sufficient proof of participation in a conspiracy. *Id.*; *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983).

The government's best case against Johnny Reese is as follows: On March 5, Johnny Reese emerged from Giddeons' car along with Lisa Reese, Colston, Colston's child and Shelton in downtown Danielsville, near the bank.[5] The car apparently had broken down. Johnny Reese stood in front of the hardware store while Lisa Reese and Colston entered the Bank of Danielsville. Shelton subsequently went into the bank as well. When they emerged from the bank, the group, joined by Johnny, talked amongst themselves as Lisa Reese appeared to be writing something down. Johnny then walked with the others to the Golden Pantry. Bryant testified that the group entered the store and Shelton discussed the bank robbery with her. She testified that Johnny Reese was present while Shelton disclosed the plan.[6] The con-

**5.** Johnny Reese argues that he was not identified as a member of this group. Drawing all inferences in favor of the government, we assume that he was a member of this group.

**6.** Tina Bryant testified on direct examination as follows:

> Q: When Mr. Shelton was relating these things to you, where were Johnny and Lisa Reese and Tina Colston in relation to Mr. Shelton and yourself?
> A: We were all standing there in front of the deli.
> Q: Could they hear what was being said by Mr. Shelton?
> A: Yes, sir.

versation was mainly between Shelton, Colston and Bryant.[7] Johnny Reese's limited contribution to the conversation in no way reflected participation or acquiescence in the planned robbery. The only reference to Johnny Reese occurred toward the end of the conversation, and reflected the fact that, until that point, Bryant was unaware of Johnny Reese's identity.[8] Further, Bryant testified that Johnny Reese was never identified as a participant in the conspiracy during any of the conversations she had with the conspirators.[9] The government makes much of the fact that while in the Golden Pantry,

Q: Did any of them disagree in any way with what he was telling you?
A: No, sir.
R3 at 32.

On cross-examination Bryant testified:
Q: And who all was present there, Ms. Bryant?
A: It was me, Buster [Shelton], Lisa, Tina and Johnny, and their little baby, Cain.
Q: And was Johnny constantly standing there?
A: Well they were playing—we were all in a little circle right there, and they with the kid, and, you know, they'd be talking, and then me and Buster would be talking.
R3 at 59.

**7.** The initial part of this conversation, containing the bulk of the discussion of the bank robbery, was not recorded as Tina Bryant was not expecting this visit from appellants and had not activated the tape recorder.

**8.** The transcript reads:
Bryant: Now who. You're married to. Who are y'all. Y'all married?
Shelton: This is Johnny. Johnny, this is Tina.
Bryant: This ain't little....little Johnny?
Johnny Reese: Lisa's Johnny.
Bryant: It is little Johnny.
Johnny Reese: Yeah.
Bryant: Alright.
Government exhibit 6 at 7.
Johnny Reese appears at one other point in the transcript.
Johnny Reese: He wants something to eat, Buster.
Government exhibit 6 at 8.
Tina Bryant testified at trial that this comment was in reference to Colston's child.

**9.** Bryant testified as follows:
Q: And is it not correct that the two people that conveyed [Johnny Reese's participation] to you were David Thomas and Buster Shelton and the fact that they contended Johnny Reese was involved in robbing the bank?
A: No, sir.
Q: Is that correct?

Johnny Reese did not object to Shelton's statements concerning the robbery scheme. As Johnny Reese was not identified as a participant, however, his failure to object carries little weight.

On March 6, Bryant had two conversations with Thomas, one at approximately 2 p.m. and another at approximately 7:30 p.m. In these conversations, Thomas told Bryant that Johnny and Lisa Reese had returned to Woodstock on the preceding evening.[10] Later that night, Bryant went to Shelton's home and spoke with him. Mention again was made of Johnny Reese.[11] The govern-

A: No, they never did come out and say it was him.
Q: They never said it was him?
A: I mean, they just—Johnny was there at the Golden Pantry while they were talking about it, and Buster would be like—well, he—he had—he never did say Johnny.
Q: Never, one time, either one of them, came out and said Johnny Reese?
A: No, sir.
R3 at 67.

**10.** The reference to Johnny Reese in the first conversation was as follows:

Bryant: Where's everybody at?
Thomas: Brenda's gone to work, Harold's in the house, kids are in school, Terry's gone to work, Buster and them's at home, Johnny and Lisa gone back home. Daddy and them came down last night and got them.
Bryant: Why?
Thomas: They wanted to go home, so we can count Johnny out.
Bryant: Oh, Johnny's not going to be in it now?
Thomas: Ah, Ah. Just me, Buster and Terry.
Bryant: Alright.
Thomas: Tomorrow morning.
Bryant: Why Johnny back out for?
Thomas: Lisa, if she was my bitch, I'd slap the bitch.
Government exhibit 7 at 1–2.
In the second conversation the reference to Johnny Reese was as follows:
Bryant: So how come Johnny backed out ... because of what's a face[.]
Thomas: Yea ...[.]
Government exhibit 8 at 8.

**11.** The relevant portion of the conversation follows:

Bryant: Well, ah. What happened to Johnny and Lisa?
Shelton: I run them off last night.
Bryant: You run them off?
Shelton: Well, I didn't run them off, I just, [their] ride came up, and I said there's your ride back to Woodstock.

ment contends that the implication from these conversations is that Johnny Reese attempted to withdraw from the conspiracy. The government argues that based on this legally ineffective withdrawal, ineffective as it occurred after the commission of an overt act in furtherance of the conspiracy, it can be inferred that Johnny Reese originally was a participant in the conspiracy. An examination of the conversations, however, reveals that the inference that Johnny Reese "backed out" of the conspiracy came from questions posed by Bryant, and not from statements made by Thomas or Shelton. In her testimony at trial, Bryant stated that she assumed that Johnny Reese was a participant although none of the other conspirators ever directly stated that he was a part of the plan. This unconfirmed assumption is not sufficient to sustain the conviction of Johnny Reese. The most that can be drawn from the comments of Shelton and Thomas made during the conversations with Bryant is that they had an expectation or a hope that Johnny Reese would participate in the planned robbery. It cannot be inferred that Johnny Reese, at any point, joined the agreement to rob the bank.

While the evidence presented by the government against Johnny Reese would allow a reasonable jury to conclude that he knew of the planned bank robbery, it does not support the conclusion that he voluntarily participated in the agreement or the accomplishments of its goals. The evidence is simply not enough for a rational trier of fact to conclude beyond a reasonable doubt that Johnny Reese participated in the conspiracy to rob the Bank of Danielsville.

Bryant: Albert and them.
Shelton: Yeah.
Bryant: That's what David said.
Shelton: I need to just get them out here. I said why don't you just take your ride, and ride home with them.
Bryant: I thought he was going to do it with you?
Shelton: Well, he was but shit, his old lady I mean she fussy too much.
Bryant: Yeah, that's what David said.
Government exhibit 9 at 6.

12. As Lisa Reese presented evidence by testifying on her own behalf, she waived the right to appeal

## Lisa Reese

As with Johnny Reese, we conclude that the evidence introduced at trial was insufficient to support a conclusion by a reasonable trier of fact of Lisa Reese's guilt beyond a reasonable doubt. Again, the government failed to produce evidence that established more than Lisa Reese's mere presence with those conspiring to rob the Bank of Danielsville.[12]

The evidence introduced at trial, viewed in the light most favorable to the government presents the following case against Lisa Reese: On the afternoon of March 5, Lisa Reese got out of Giddeons' car along with Johnny Reese, Shelton, Colston and Colston's child. Lisa Reese, Colston and her child went into the bank. Inside, they requested information about opening an account, asked if the bank had a public restroom and picked up some bank brochures. The bank videotape reveals that they were inside the bank for less than three minutes. As they prepared to leave, Shelton entered the bank and then ushered them out. The group consolidated on the sidewalk. While the group was standing together, Lisa Reese appeared to be writing something on a small pad.

At the Golden Pantry, Shelton stated to Bryant that "the girls" just made sketches of the bank. When Bryant was asked, at trial, to whom Shelton was referring, she stated that he was referring to Lisa Reese and Colston. She testified on direct examination that Lisa Reese was present during this conversation and did not object to anything said by Shelton. During cross-examination, however, it became apparent that Lisa Reese entered the Golden Pantry prior to, and left earlier than the others.[13] Bryant testified

the denial of the Rule 29(a) motion she made at the close of the government's case. Therefore, we consider all the evidence produced at trial against Lisa Reese in evaluating her claim of insufficient evidence. *United States v. Correa-Tobon,* 748 F.2d 1509, 1511 (11th Cir.1984).

13. Tina Bryant's testimony on cross-examination was as follows:
Q: You don't recall [Lisa Reese] coming in, buying a pack of cigarettes, and then walking back out?
A: Well, at that time, when she come in, the rest of them hadn't been in there yet. I seen her come in first.

that she never spoke to Lisa Reese, nor did Lisa Reese speak to her during the entire time that Lisa was in the Golden Pantry. Lisa Reese testified that while the group was in the Golden Pantry she spent most of her time on the public telephone attempting to get someone to take Johnny and her back to Woodstock. Lisa Reese's failure to object to Shelton's statement that "the girls" made sketches of the bank adds little in that she was not specifically identified by Shelton and it is unclear from the testimony whether Lisa Reese heard this statement. The sketch was never recovered, nor referred to in any of the subsequent conversations. The only references to Lisa Reese in the taped conversations reflect her distaste for the planned bank robbery.[14]

At trial, Lisa Reese testified that at her home in Woodstock, prior to her trip to Danielsville, Shelton, Thomas and Giddeons discussed the planned bank robbery, but she did not think that they were serious. She stated that subsequently on March 4, at Shelton's home, she heard discussions between Shelton, Thomas and Giddeons about the planned robbery. She did not take those discussions seriously either. Lisa Reese admitted going into the bank on March 5, but stated her only purpose in going into the

> Q: Did she come in and then just come right over to where you were standing?
> A: No; because the deli is away from where the cashier and stuff is.
> . . .
> A: . . . When they come—when she come in, it was a bit after [Thomas] had come in. Like, when she come in, then Buster and Tina and Johnny come in. I didn't see her buy cigarettes or anything, because me and Buster hadn't talked then.
> Q: Once everybody got there, okay—
> A: Okay.
> Q: —when everybody was there, is it your testimony that Lisa Reese stayed inside that store near you the entire time?
> A: Yes.
> Q: You didn't see—she didn't leave while everybody else was there?
> A: No.
> Q: Okay.
> A: Well, now, she left earlier before anybody else did because her and Johnny were fussing.
> Q: Fussing?
> A: Yeah. They were, like, upset.
>
> R3 at 70–72.

bank with Colston was to inquire whether the bank had a public restroom. She denied making any sketches of the bank or writing anything at all after emerging from the bank, although she stated that after leaving the bank she referred to the brochures that Colston had taken from the bank.

As a rebuttal witness the government called FBI agent Sally Heintz. Heintz testified that Lisa Reese gave a statement after her arrest. In that statement Lisa Reese admitted that the purpose of the trip to Danielsville was to survey the town in conjunction with a planned bank robbery. Heintz testified that Lisa Reese knew this at the time of the trip to Danielsville.[15] Heintz also confirmed that Lisa Reese had told her that she did not take the plan seriously and that she had entered the bank in order to inquire about using a restroom.

■ Based on this evidence, we conclude that the government failed to meet its burden of proving Lisa Reese's guilt. The government makes much of the testimony of Ardis Anglin that Lisa Reese "done like she was writing" after coming out of the bank [16] and her failure to object to Shelton's statement that "the girls" made sketches of the bank. This evidence is simply not enough to

---

14. *See* notes 10–11. In the conversation between Tina Bryant and Shelton on the night of March 6, further reference is made to Lisa Reese:

Shelton: [Lisa Reese] uh uh, if she'd been here she'd threw up on us. We were down there behind the bank. We was walking through the carport. We were walking to the store she saw that. One of them said something about stealing something. I know it was a stupid idea and all that but, she spoke up and said (ya'll so crazy and all, it's stupid for ya'll to rob a bank and all this). It made me mad and I said why don't you shut up you bitch, and go back to Woodstock. And that's what I told her. She stormed down through there and then she got mad at Johnny cause she was mad at me.
Government exhibit 9 at 6.

15. The trip referred to in the statement appears to be the trip into Danielsville on March 5, and not the Reeses' initial trip to Danielsville from Woodstock.

16. Ardis Anglin was an employee at the courthouse across the street from the bank. He testified that he observed the group from a window on the second floor of the courthouse.

support her conviction. Based on the evidence produced at trial, it is unreasonable to infer that Lisa Reese sketched a drawing of the bank for the purpose of assisting the planned bank robbery and that she agreed to participate in the planned robbery. The testimony of Lisa Reese and Heintz both support the conclusion that Lisa Reese did not take the plan seriously. Even assuming, however, that she knew the plan was serious, such knowledge does not show that she agreed to participate. The recorded comments of Thomas and Shelton indicate that Lisa Reese hampered, rather than helped in the planned bank robbery, and do not demonstrate that Lisa Reese joined the conspiracy or voluntarily assisted it. We conclude, therefore, that no reasonable jury could find that Lisa Reese's guilt in the conspiracy was proven beyond a reasonable doubt.[17]

*David Thomas*

 Because we have reversed the conviction of Lisa Reese, and as Tina Colston was acquitted, we must address the claim raised by Thomas that no overt act occurred in this case.[18] The indictment charged that Lisa Reese, Colston and Shelton entered the bank for the purpose of casing it and the videotape introduced at both trials corroborated that all three entered the bank.[19] Although Shelton was inside for a very brief period, we conclude that a reasonable jury could find that he cased the bank during this visit in furtherance of the planned bank robbery. Shelton is seen on the videotape outside of the glass doors of the bank. At both trials the bank was described as "small" and photographs depicting the bank were admitted into evidence. The evidence also showed that the bank vaults could be seen upon entering the bank. Given the size and the lay-out of the bank it would not take long to look around for the purpose of planning a robbery. This is particularly true here, as Shelton was already familiar with the bank.[20] As such, a reasonable jury could find that Shelton cased the bank during his brief entry and that Shelton's actions constituted the overt act in this case.[21]

 Thomas also claims that the evidence was insufficient to show his intent to rob the bank. We disagree. Thomas confessed to the FBI and gave great detail about the robbery scheme. Thomas related his specific role in the offense, explained the

17. Because we reverse Lisa Reese's conviction due to insufficient evidence we do not address her other claim on appeal that the admission at trial of statements by her non-testifying codefendants violated *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

18. We note that we are not deciding the issue of whether an overt act is needed for a Hobbs Act conspiracy. There is a split in the circuits on this issue. *Compare United States v. Tormos–Vega*, 959 F.2d 1103, 1115 (1st Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 135 (1992) (stating that no overt act is required) *and United States v. Maldonado–Rivera*, 922 F.2d 934, 983 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991) (same) *with United States v. Stephens*, 964 F.2d 424, 427 (5th Cir.1992) (holding that an overt act is required) *and United States v. Benton*, 852 F.2d 1456, 1465 (6th Cir.), *cert. denied*, 488 U.S. 993, 109 S.Ct. 555, 102 L.Ed.2d 582 (1988) (same).

In the indictment, at trial, and on appeal the government explicitly assumed that an overt act must be proven for a Hobbs Act conspiracy. The government assented to charging a 18 U.S.C. § 371 conspiracy as a "lesser included offense," at trial, although 18 U.S.C. § 371 requires proof of an overt act. As the government has not advanced the argument that the Hobbs Act does not require an overt act, the issue is not properly before this court.

19. The district court instructed the jury that the overt act charged in the indictment was the only overt act that they could consider. This instruction was not objected to by the government at trial or on appeal. As such, we confine ourselves to the consideration of the overt act charged in the indictment.

20. During one of the audiotaped conversations, Bryant asked Shelton why he planned to rob the bank of Danielsville and not some other bank. Shelton responded, "I know the bank very good, very good. In that bank I know where the safes at and everything." Government exhibit 6 at 3.

21. Of course, an individual conspirator need not participate in the overt act in furtherance of the conspiracy. Once a conspiracy is established, and an individual is linked to that conspiracy, an overt act committed by any conspirator is sufficient. *United States v. Veltre*, 591 F.2d 347, 350 (5th Cir.1979). (In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to October 1, 1981.)

plan to dynamite the sheriff's office as a diversion, detailed where they intended to steal the weapons, the type of weapons that were to be used, the person from whom they were to obtain the dynamite and the getaway plan. Similarly specific details were related to Bryant. Further, the videotape of the Bank of Danielsville showed that Thomas entered the bank on March 5 after Lisa Reese, Colston and Shelton left.[22] This evidence was sufficient to support the jury finding that Thomas did in fact intend to go through with the plan. As such, we reject Thomas' claim of insufficient evidence.

*William Shelton*

■ Shelton raises the claim of insufficient evidence, also arguing that no overt act occurred in this case. For the reasons stated above we find that Shelton's entry into the bank constituted the overt act in this case.

Shelton claims, as did Thomas, that the evidence was insufficient to prove that he intended to go through with the plan. Again we disagree. Shelton's intent is supported by the specificity with which he related the scheme to Bryant. Shelton discussed the details of the robbery at length with Bryant, including the amount of money that they suspected would be at the bank, the nature of the alarm system, the plan to dynamite the police station to create a diversion, the name of the person who would supply him with dynamite, what he intended to do with the stolen money, the possible consequences of the plan in terms of human life, the possibility that he would go to jail and his concern that Thomas was telling too many people about the robbery scheme. Based on the evidence introduced, we conclude that a reasonable jury could conclude that Shelton intended to carry out the plan.

### III.

■ Shelton contends that portions of the closing arguments of the prosecution were improper. As Shelton did not raise this claim at trial, we examine the prosecutor's argument for plain error. *United States v. Eley*, 723 F.2d 1522, 1525–26 (11th Cir.1984).

During the government's closing argument the prosecutor stated:

I expect that it's going to be argued to you that these people are young and this is just a joke to young people. Well, ladies and gentleman, I submit to you that's an insult to every 18, 19 or 20 year-old person in this country who has been called by their country into military service and who has gone over to Vietnam or gone over to Grenada or gone over to Panama or gone over to Saudi Arabia and has been called on to act like adults and to do serious life-threatening business as part of their patriotic duty. And for these people of the same age to come in and say, "Oh, we're only 18 and 19, and we were only kidding," hogwash. That doesn't fly.

(R16 at 23–24.) Shelton contends that this argument was so egregiously prejudicial that the whole trial was tainted. He points to the fact that, at the time of trial, the Persian Gulf War had been recently concluded and argues that the statements were inflammatory. The government responds that this argument was entirely proper as it was taken to counter the defense strategy that the defendants were engaged in childish bragging.

■ To warrant reversal of a verdict prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial. *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir.1987). Specifically, a prosecutor's remark during closing argument must be both improper and prejudicial to a substantial right of the defendant. *United States v. Bascaro*, 742 F.2d 1335, 1353 (11th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 3477, 87 L.Ed.2d 613 (1985). Without deciding whether the argument in this case was improper, we conclude that it did not constitute plain error. *See United States v. Wiggins*, 788 F.2d 1476, 1478 (11th Cir.1986). The thrust of Shelton's defense was that he did not take the plan seriously and was simply bragging or boasting. Shelton introduced evidence of his current reputation as a braggart, and his history as a child of boast-

---

**22.** We do not consider Thomas' entry into the bank as the overt act in this case as his entry into

the bank was not charged in the indictment as an overt act. *See* note 19.

ing and clowning. Had Shelton directly advanced the argument that the jury should consider his present age to conclude that he did not intend to carry out the planned robbery, the prosecutor's comments may have been appropriate as a response to such a defense strategy. *Bascaro,* 742 F.2d at 1354. Here, neither Shelton nor his codefendant directly advanced this argument. Given the nature of the evidence introduced by Shelton, however, we conclude that the prosecutor's argument in this case did not so prejudice appellant so as to constitute reversible error.

## IV.

## A.

■■■■■ Giddeons claims that the court erred in refusing to include a requested jury instruction. The refusal to give a requested instruction is error if the requested instruction is a correct statement of law, is not substantially covered by other instructions that are delivered and deals with some point in the trial that is so vital that the failure to give the instruction seriously impaired the defendant's case. *United States v. Stone,* 702 F.2d 1333, 1339 (11th Cir.1983).

Giddeons requested that the jury be charged that:

The defendants contend that they did not intend to carry through with a plan to rob the Bank of Danielsville. Defendants further contend that the plan was merely an elaborate fantasy or game. If there remains a doubt in your mind whether the defendants specifically intended to rob the Bank of Danielsville, then you must acquit them.

Giddeons argues that the failure to give this charge, coupled with the court's failure to instruct the jury on specific intent, impaired his presentation of the theory that the defendants were not serious about going through with the plan. The court's instructions on conspiracy, however, made it clear

that in order to find a defendant guilty of conspiracy, the jury must find that each defendant willfully agreed to accomplish an unlawful plan. The court instructed the jury on "willfully":

The word "willfully" as that term has been used from time to time in these instructions, means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids—that is, with bad purpose either to disobey or disregard the law.

Thus, the instructions adequately informed the jury that if they believed that the defendants were only joking about the plan the jury must acquit the defendants. As the requested instruction was adequately covered by the charge as a whole, the refusal to give the instruction was not error. *United States v. Lively,* 803 F.2d 1124, 1128 (11th Cir.1986).

## B.

■■■■■ Shelton raises several objections to the district court's charge in his case, none of which were raised at trial. Thus we review these claims under a plain error standard. *United States v. Fuentes–Coba,* 738 F.2d 1191, 1196 (11th Cir.1984), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985). Shelton's conviction will be set aside only if "the charge is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice or where it would seriously affect the fairness, integrity or public reputation of a judicial proceeding." *Id.* (citing *United States v. Thevis,* 665 F.2d 616, 645 (5th Cir. Unit B), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)). Shelton contends that the trial court erred in giving the definition of robbery that appears in 18 U.S.C. § 1951 rather than the common law definition.[23] The Hobbs Act definition of robbery does not seem to require a finding of specific intent whereas at common law robbery required such a finding. Shelton points

---

**23.** The Hobbs Act states:

As used in this section—

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, im-

mediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b) (1988).

to *United States v. Nedley*, 255 F.2d 350 (3rd Cir.1958) to support his claim. In *Nedley*, the Third Circuit held that the common law definition of robbery should be read into the Hobbs Act.

Supreme Court cases interpreting the Hobbs Act, although not specifically rejecting *Nedley*, indicate that it may have been wrongly decided. In *United States v. Culbert*, 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978), the Court was called upon to interpret the Hobbs Act with respect to an extortion charge. In addressing a claim that racketeering was a necessary element of a Hobbs Act violation, the Court stated,

> the statutory language sweeps within it all persons who have "in any way or degree ... affect[ed] commerce ... by robbery or extortion." 18 U.S.C. § 1951(a) (1976 ed.). These words do not lend themselves to restrictive interpretation; as we have recognized, they "manifest ... a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence," *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). The statute, moreover, carefully defines its key terms, such as "robbery," "extortion," and "commerce."

*Id.* at 373, 98 S.Ct. at 1113 (footnote omitted). The Court concluded, "Our examination of the statutory language and the legislative history of the Hobbs Act impels us to the conclusion that Congress intended to make criminal all conduct within the reach of the statutory language." *Id.* at 380, 98 S.Ct. at 1117. We determine that the jury instruction which used the Hobbs Act definition of robbery was not plain error.

Shelton also contends that the charge given by the district court in his trial failed to require that the jury find Shelton specifically intended to commit the robbery. Because the instructions given at Shelton's trial contained the same instructions as to willfulness given in the first trial and outlined above as well as the specific intent instruction requested by Giddeons, we conclude that there was no plain error with respect to the trial court's instructions on specific intent.

## C.

Shelton and Thomas also claim that the district court erred in not properly distinguishing between the Hobbs Act violation and what was termed the lesser included offense, conspiracy to rob the bank under 18 U.S.C. §§ 371 and 2113(a). The district court, in both trials, gave distinct instructions on the Hobbs Act and conspiracy under 18 U.S.C. § 371. Although appellants argue that the two crimes were confused in the instructions, they do not point out the manner in which they should have been distinguished.[24] We conclude that the district court's instructions did not constitute plain error in either trial.

## V.

In the first trial, after deliberations over the span of three days, and two communications to the district court that the jury was deadlocked, one of the jurors sent a note to the court stating that another member of the jury was screaming and using profanity, upsetting one juror. After consultation with counsel in chambers, the district court indicated that the best way to deal with the problem was for it to address the jury, without counsel, but with a court reporter, and instruct them to respect each others feelings. The district court stated its concern that addressing this matter in open court would prove embarrassing for the jurors. There was no objection to this proposal. After the district court addressed the jury, a tape of the court's statements to the jury was played for counsel. At that time, counsel for Thomas stated that he had no objections to the court's statements. Thomas now contends that it was improper for the district court to address the jury outside of the presence of counsel. An objection not

---

**24.** We note that we are not deciding that the elements of the two crimes are the same. Shelton states that the Hobbs Act differs from an 18 U.S.C. § 371 conspiracy in that the Hobbs Act does not require proof of an overt act, while a § 371 conspiracy does. As stated in note 18, we do not decide this issue. Assuming Shelton has correctly stated the law, however, any error in the court's instructions benefitted appellants and was therefore harmless.

raised at trial is subject to a plain error analysis. *United States v. Guerrero,* 935 F.2d 189, 193 (11th Cir.1991).

Thomas does not point to any specific improper statements by the court, but rather emphasizes the fact that the jury returned a verdict in less than an hour after the court addressed them. Thomas argues that the jury must have felt intimidated or pressured by the court. A review of the district court's comments to the jury reveals that the court did not attempt to pressure the jury.[25] In responding to the communication from the jury, the district court first informed counsel of the content of the note and its inclination to address the jury alone, as well as explaining the reason for not addressing the jury in open court. The district court then played a tape recording of the communication for counsel and no objections were made. As such, we conclude that it was not plain error for the court to address the jury without counsel. *See United States v. Rapp,* 871 F.2d 957 (11th Cir.), *cert. denied,* 493 U.S. 890, 110 S.Ct. 233, 107 L.Ed.2d 184 (1989) (the delivery of a modified *Allen* charge to the jury, outside the presence of and without prior communication with counsel held harmless error); *United States v. Watchmaker,* 761 F.2d 1459, 1465–66 (11th Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 880, 88 L.Ed.2d 917 (1986) (finding court's private communication with juror concerning the juror's fear of the defendants' harmless).

## VI.

 Shelton claims that the verdict form, which provided two possible boxes to check to find him guilty and only one box to check to find him not guilty, was unduly prejudicial. As this claim was not raised below we review it under a plain error standard. *United States v. Guerrero,* 935 F.2d at 193 (1991).

Shelton's claim has no merit and can be briefly rebutted by the fact that the jury acquitted Shelton's codefendant, Colston, using an identical verdict form. Shelton has not established plain error.

## VII.

 Giddeons and Shelton contend that the district court improperly refused to grant a three point reduction in base offense level based on Sentencing Guideline § 2X1.1. They do not contest the total offense level of 22, but object to the failure of the court to reduce that level by three points as required by § 2X1.1 for conspiracies that are not covered by a specific offense guideline. The application of a sentencing guideline to uncontested facts is subject to plenary review. *United States v. Gonzalez–Lopez,* 911 F.2d 542, 549 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

Section 2X1.1(c)(1) of the Guidelines instructs that when "a conspiracy is expressly covered by another offense guideline section, apply that section." Section 2E1.5 of the Guidelines covers Hobbs Act extortion or robbery, but does not specifically mention conspiracy. A conspiracy to violate the Hobbs Act is a violation of the Hobbs Act itself. Thus, there is no differentiation in the statute between a conspiracy and a completed offense under the Hobbs Act. Addressing this very issue the Second Circuit stated,

> We do not interpret this instruction, as it applies to conspiracies, to mean that the word "conspiracy" itself must appear in the "[ ]other" guideline to be applied; rather, we also consider conspiracy to be expressly covered by a given guideline if the guideline expressly covers a stated statutory section and that section expressly pro-

---

**25.** The court stated in part:

This is an unusual thing for a judge to come into the jury room, and the first thing I want to say is that I am not here to lean on you one way or the other. As I said in my charge, the court has no opinion in this case. The court is neutral. . . .

I have a note from somebody who indicates that yesterday feelings got rough, and that is okay. That happens. People get passionate about a trial. I can't tell you not to speak out for your point of view because in the whole charge it was—at the end I told you, you know, to exchange opinions and things. . . . I am speaking both as a judge and just a person who wants to, you know, pass along something you already know, and that is, that you can stand up for your position, but what is that old term, "People can disagree without being disagreeable."

R9 at 31–32.

hibits conspiracy. *Cf. United States v. Williams,* 891 F.2d 962, 965 (1st Cir.1989) (§ 2X1.1 reduction of offense level for "attempt" does not apply when offense of conviction is violation of a statutory section that itself expressly prohibits attempts). Thus, where the statutory section defining the offense of conviction prohibits conspiracy, and that section is expressly covered by a particular guideline, the offense level provided by that guideline is controlling, and § 2X1.1 does not apply.

*United States v. Skowronski,* 968 F.2d 242, 250 (2nd Cir.1992). We find this reasoning persuasive and conclude that the district court properly refused to apply § 2X1.1 to a Hobbs Act conspiracy.

\* \* \*

For the reasons stated above we REVERSE the convictions of Johnny Reese and Lisa Reese and AFFIRM the convictions and sentences of all other appellants.