[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14820
Non-Argument Calendar

_____

D.C. Docket No. 3:17-cr-00129-BJD-JBT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE CALDERON-FUENTES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 13, 2019)

Before MARTIN, NEWSOM, and ANDERSON, Circuit Judges.

PER CURIAM:

Jose Calderon-Fuentes ("Calderon") appeals his conviction for theft of government property, challenging the district court's denial of his motion to suppress evidence and motion for a judgment of acquittal.  He argues that (1) the district judge should have reheard the testimony regarding his motion to suppress anew; (2) the district court erred in denying his motion to suppress because his consent was coerced and unwilling; (3) the district court denied him the right to present a complete defense by excluding as demonstrative evidence low vision simulators that were relevant, not prejudicial, and would have aided the jury in understanding the physical principles involved in having low vision; and (4) the evidence was insufficient to sustain the jury's verdict.

## I.

The district judge's decision not to hold an evidentiary hearing is reviewed for abuse of discretion.  *United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006).  We afford great deference to the district court's credibility determinations. *United States v. Clay*, 376 F.3d 1296, 1302 (11th Cir. 2004).

Under the Federal Magistrate's Act, a district judge may designate a magistrate judge to conduct a suppression hearing, but must make a *de novo* determination as to those portions of the magistrate judge's report and recommendation ("R&R") to which objection is made.  28 U.S.C. § 636(b)(1). While the Act requires a *de novo* determination, it does not require a *de novo*

2

hearing. *United States v. Raddatz*, 447 U.S. 667, 674 (1980). In making such determination, the district judge may rely on the magistrate judge's proposed findings and recommendations to whatever extent it chooses in the exercise of its sound judicial discretion. *Id*. at 676. The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). However, we recognized in *United States v. Cofield* that, generally, a district judge must rehear disputed testimony before rejecting a magistrate judge's credibility determinations. 272 F.3d 1303, 1306 (11th Cir. 2001).

Here, the district judge did not abuse his discretion in not conducting a *de novo* evidentiary hearing for the disputed testimony. *See Arbolaez*, 450 F.3d at 1293. The district judge made a *de novo* determination as to the disputed testimony, relying on the R&R's findings and recommendations, which was sufficient. *See* 28 U.S.C. § 636(b)(1); *Raddatz*, 447 U.S. at 674, 676. The district judge did not reject any portion of the magistrate judge's credibility determinations or factual findings, and, therefore, no rehearing was required. *See Cofield*, 272 F.3d at 1306.

## II.

3

In reviewing a district court's suppression ruling, we examine factual findings for clear error and review the court's legal conclusions *de novo*. *See United States v. Hollis*, 780 F.3d 1064, 1068 (11th Cir. 2015). We review the entire record in the light most favorable to the party prevailing below. *Id.*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Evidence seized during an unlawful search cannot be used against the victim of the search. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). This exclusionary rule bars physical, tangible materials obtained as a result of an unlawful invasion as well as "testimony as to matters observed during an unlawful invasion." *Id.*

A home's curtilage is entitled to the same Fourth Amendment protections as the home. *Oliver v. United States*, 466 U.S. 170, 180 (1984). "Curtilage" is an area immediately adjacent to the home that an individual reasonably expects will remain private. *Id.*

The Fourth Amendment is not implicated by a police officer's entry onto private land "to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006). Unless the person in possession of the home expressly orders otherwise, "an officer may walk up the steps and knock on the

front door of any man's [home] with the honest intent of asking questions of the occupant thereof." *Id.* (quotation marks omitted). Thus, police may knock on a person's door "or otherwise approach the residence to speak to the inhabitants" like any private citizen could. *Id.* Further, the person who opens the door has no obligation to do so. *Kentucky v. King*, 563 U.S. 452, 469-70 (2011). "And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Id.* at 470.

In *Taylor*, we rejected the argument that officers violated the Fourth Amendment by opening a closed gate on Taylor's property without a warrant, entering the property, proceeding down the driveway, and knocking on the front door. *Taylor*, 458 F.3d at 1204. We held that the officers' initial entry onto Taylor's property was for a lawful "knock and talk," which is an exception to the Fourth Amendment's warrant requirement. *Id.* at 1204-05.

Another exception to the warrant requirement is where the defendant voluntarily consented to the search. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Generally, for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice. *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). "The government bears the burden of proving

the voluntariness of the consent."  *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984).

Whether a defendant's consent was voluntary depends on the totality of the circumstances.  *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001). We must scrutinize the facts and strike a balance between the defendant's "right to be free from coercive conduct and the legitimate need of the government to conduct lawful searches."  *Garcia*, 890 F.2d at 360.

> Relevant factors in determining voluntariness, none of which is dispositive, include voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

*Chemaly*, 741 F.2d at 1352.  "While the government is not required to prove that [the defendant] knew he had the right to refuse to consent, such knowledge or lack thereof is a factor to consider in determining voluntariness."  *Id.* at 1353.

"The Fourth Amendment allows some police deception so long as the suspect's will was not overborne."  *United States v. Spivey*, 861 F.3d 1207, 1214 (11th Cir. 2017), *cert denied*, 138 S. Ct. 2620 (2018).  Generally, police officer deception about the nature and purpose of their investigation, even if they deliberately lie, will not invalidate consent, as "the only relevant state of mind for voluntariness is that of the suspect himself."  *Id.* at 1215 (quotation marks and

alteration omitted).  However, law enforcement may not "lie about the existence of exigent circumstances" or a warrant, as such lie would suggest that "the occupant has no right to resist and may face immediate danger if he tries."  *Id.* at 1213.

In *Spivey*, we held that a credit card fraud suspect's consent to the search of his residence was voluntary, even though law enforcement officers pretended to be following up on a burglary and misrepresented that a federal agent was a crime scene technician.  *Id.* at 1210-11.  We held that, considering the totality of the circumstances, all factors other than deceit pointed in favor of voluntariness.  *Id.* at 1215.  We noted that the officers' ruse did not prevent the defendant from making a voluntary decision, and the officers "did not claim any authority that they lacked."  *Id.* at 1216.

We specifically rejected reliance on the statement that "intimidation and deceit are not the norms of volunteerism," which was dictum in *Alexander v. United States*, 390 F.2d 101, 110 (5th Cir. 1986), outside of the context of a ruse following an illegal arrest.  *Id.* at 1217 (quotation marks and alteration omitted).  We also noted that we had "never applied [*Tweel*[1]] outside the administrative context . . .[which] makes sense in light of the rule that police officers are

---

[1] In *United States v. Tweel*, our predecessor court held that consent was involuntary where it was induced by an official misrepresentation that suggested the investigation was only civil, not criminal.  550 F.2d 297, 299 (5th Cir. 1977).

permitted to obtain a confession through deception under the Fifth Amendment."
*Id.* at 1213.

A defendant can establish that his consent was involuntary if he establishes both that (1) he was particularly vulnerable — mentally or physically — to police coercion; and (2) the police actually employed a substantial element of coercive conduct to obtain consent, either by force or "more subtle forms of psychological persuasion." *See Colorado v. Connelly*, 479 U.S. 157, 164 (1996).

The Supreme Court has held that a defendant's consent was involuntary due to his particular vulnerability where the defendant was interrogated for four hours while incapacitated and sedated in an intensive care unit. *Mincey v. Arizona*, 437 U.S. 385, 385-86 (1978). It also held that a defendant's consent was involuntary where he was on medication and interrogated for over 18 hours without food or sleep. *Greenwald v. Wisconsin*, 390 U.S. 519, 519-20 (1968).

To the extent that Calderon argues that the agents violated the Fourth Amendment by walking through a closed gate and onto his property, the evidence and law refute this claim. First, although he maintains that the gate was closed, sufficient evidence was presented at the suppression hearing that the gate was open on both visits, including the testimony of both agents. Thus, the district court did not clearly err in finding that the gate was open. *See Hollis*, 780 F.3d at 1068.

8

Second, the agents' actions of walking through the open gate to where Calderon was working in his yard during the second visit amounted to a lawful knock and talk and did not implicate the Fourth Amendment. *See Taylor*, 458 F.3d at 1204-05. The agents called to Calderon as they were walking through the gate onto his property, and asked if he would speak with them, and he agreed. Calderon could have asked the agents to leave and/or refused to speak with them. *See Kentucky*, 563 U.S. at 470. Further, it is worth noting that, even if the gate was closed, the agents did not commit a Fourth Amendment violation by opening it and walking into the yard where Calderon was in order to speak with him. *See Taylor*, 458 F.3d at 1204. This Court rejected a very similar argument in *Taylor*. *See id.*

With respect to the first *Chemaly* factor, the totality of the circumstances demonstrates that Calderon's consent was voluntarily given. He was not in custody during either interview with the agents. *Chemaly*, 741 F.2d at 1352. The conversation was casual during both interviews, he was never placed in handcuffs, and the agents never raised their voices.

Turning to the second *Chemaly* factor, the police procedure used in each interview was not coercive. Although the agents were deceptive in their first interview about who they were and why they wanted to speak with Calderon, they did not claim to have any authority to compel him to speak with them such as exigent circumstances or a warrant. *Spivey*, 861 F.3d at 1213-14. This case is like

9

*Spivey*, where law enforcement agents pretended to be following up on a burglary and misrepresented that a federal agent was a crime scene technician, because the agents here initially represented themselves to be Homeland Security Investigations agents interested in talking to Calderon about his international travels. *See Spivey*, 861 F.3d at 1210-11.

Third, Calderon cooperated with the police during both interviews, including the December 2012 interview during which the agents told him that they were investigating him regarding his VA benefits. *Chemaly*, 741 F.2d at 1352. Calderon freely chose to speak with the agents and invited them onto his screened-in porch to discuss the matter during the December 2012 interview.

Fourth, as to Calderon's awareness of his right to refuse consent to search, although he was not told by the agents during the first interview that he had such a right, they told him that his participation in the second interview was voluntary and that he could stop the interview at any time. Fifth, Calderon appeared to be sufficiently intelligent to consent, as the magistrate judge found, given his work as an aircraft mechanic in the Navy for 21 years.

Thus, the first five *Chemaly* factors weigh in favor of voluntariness. *See Chemaly*, 741 F.2d at 1352. Sixth, as the magistrate judge found, it is unclear whether Calderon believed that no incriminating evidence would be found during the June 2012 interview, as he did not know the real reason for the agents' visit.

10

However, this is substantially outweighed by the other *Chemaly* factors. *Chemaly*, 741 F.2d at 1352. The district court did not clearly err in making any of the factual findings discussed above, and it correctly concluded, based on those facts, that Calderon voluntarily consented to the agent interviewing him at his home. *See Hollis*, 780 F.3d at 1068.

Finally, Calderon's eye disease did not make him more vulnerable in the context of a voluntariness analysis. *See Connelly*, 479 U.S. at 164. Although he may not have been able to see well, he could see well enough to drive and work on his boat. Further, even if he was effectively blind (which he has not shown), his eye disease did not come close to rising to the level of the defendants' vulnerabilities in *Mincey* or *Greenwald*, as he was not incapacitated, sedated by medication, confined to a hospital bed, deprived of food or water, or interrogated for hours during either visit with the agents. *See Mincey*, 437 U.S. at 385-86; *Greenwald*, 390 U.S. at 519-20. The agents also did not take any action that overbore Calderon's will. *See Spivey*, 861 F.3d at 1214. The interaction between Calderon and the agents was cordial throughout both interviews.

Accordingly, evaluating the totality of the circumstances, Calderon voluntarily consented to the agents' interviews in both June and December 2012 and the district court did not err in so determining.

11

### III.

We review the district court's evidentiary rulings at trial for abuse of discretion. *United States v. Hough*, 803 F.3d 1181, 1193 (11th Cir. 2015). Even when an evidentiary ruling was erroneous, we will not reverse a conviction if such error was harmless. *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005). An error is harmless where it does not have "a substantial influence on the outcome of the case" or leave "grave doubt as to whether [it] affected the outcome." *Id.*

We recognize a "significant range of choice for the district court on evidentiary issues" and give the district court's evidentiary rulings "considerable deference." *United States v. Brown*, 415 F.3d 1257, 1265 (11th Cir. 2005). Generally, "the district court has wide discretion to admit evidence of experiments conducted under substantially similar conditions." *Barnes v. Gen. Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977). The burden is on the party offering a demonstrative exhibit to show that it is "the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed." *Id.*

A demonstrative exhibit, like any evidence, should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. A defendant's

right to present a defense is tempered by Rule 403 and subject to the restrictions in Rule 401. *See United States v. Anderson*, 872 F.2d 1508, 1519 (11th Cir. 1989); *see also* Fed. R. Evid. 401.

Here, the district court did not abuse its discretion in finding that the simulators were inadmissible. The court reasonably concluded that the simulators were not relevant to a material issue in the case because the conditions they purported to simulate were untested, and such conditions did not specifically replicate those experienced by someone with granular corneal dystrophy. Finally, even if the court had abused its discretion, any error would be harmless, because the jury's use of the simulators would not have substantially affected the outcome of the case. *See Henderson*, 409 F.3d at 1300.

IV.

We review a challenge to the sufficiency of the evidence *de novo*, considering "the evidence in the light most favorable to the government and draw[ing] all reasonable inferences in favor of the jury's verdict." *United States v. Wilson*, 788 F.3d 1298, 1308 (11th Cir. 2015). We consider all evidence produced at trial against the defendant in evaluating his claim of insufficient evidence. *United States v. Thomas*, 8 F.3d 1552, 1558 n.12 (11th Cir. 1993).

The relevant question in determining whether the evidence was sufficient is whether any rational factfinder could have found the essential elements of the

crime beyond a reasonable doubt. *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005). We are bound by the jury's "rejection of the inferences raised by the defendant." *Id.* at 1334-35. Where a statement by the defendant is disbelieved by the jury, it may be considered as substantive evidence of the defendant's guilt. *United States v. Hughes*, 840 F.3d 1368, 1385 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 1354 (2017). "And this principle applies equally to false exculpatory statements made pre-trial" and those made on the stand. *Id.*

In deciding whether the evidence was sufficient, we do not distinguish between circumstantial and direct evidence. *United States v. Tate*, 586 F.3d 936, 945 (11th Cir. 2009). Circumstantial evidence is frequently more than sufficient to establish guilt beyond a reasonable doubt. *United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982). If the government seeks to meet its burden of proof using circumstantial evidence, it must rely on reasonable inferences to establish a *prima facie* case. *United States v. Mieres-Borges*, 919 F.2d 652, 657 (11th Cir. 1990).

A person who steals or "knowingly converts to his use or the use of another" any money "of the United States or of any department or agency thereof," violates 18 U.S.C. § 641. *See* 18 U.S.C. § 641. A violation of § 641 is shown with proof that (1) the money belonged to the United States, (2) the defendant stole the money for his use or the use of someone else, and (3) the defendant knowingly and

14

willfully intended to deprive the United States of the money. *Wilson*, 788 F.3d at 1309.

"In this Circuit, to establish the requisite criminal intent, the government need only prove that defendant knowingly used government property for his own purpose in a manner that deprived the government of the use of that property." *Id.* (quotation marks and alterations omitted). "The defendant must know that his taking of property is an unlawful conversion." *Id.* "Knowing conversion" requires that the defendant had knowledge of the facts, though not necessarily the law, that made the taking a conversion. *Id.*

For the government to show that a defendant's illegal action was willful, it must present evidence proving that the defendant acted with knowledge that his conduct was unlawful. *Bryan v. United States*, 524 U.S. 184, 191-92 (1998). Generally, "when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'" *Id.* at 191.

Here, the circumstantial evidence presented at trial was sufficient for a reasonable jury to conclude, beyond a reasonable doubt, that Calderon knowingly and willfully stole government property. Calderon admitted that, since 2008 when he went to renew his Florida driver's license, he knew that he was receiving more money from the Department of Veterans Affairs ("VA") than he should have been. The videos of Calderon driving his truck coupled with his multiple express

15

statements to agents and VA technicians that he did not drive due to his eye condition, demonstrates his dishonesty regarding his sight ability. A reasonable jury could find that Calderon had lied to the VA and that his untruthfulness was evidence of willfulness. *See Hughes*, 840 F.3d at 1385. Accordingly, we affirm Calderon's conviction and the denial of his motions.

**AFFIRMED.**

MARTIN, Circuit Judge, dissenting:

In denying relief to Mr. Calderon-Fuentes on his claim that his Fourth Amendment rights were violated by officers who were investigating him, the Majority Opinion relies on this court's ruling in United States v. Spivey, 861 F.3d 1207, 1214 (11th Cir. 2017). I dissented in Spivey, see id. at 1218–24 (Martin, J., dissenting), and continue to believe it was wrongly decided.

Our Constitution's Fourth Amendment protects people from having government agents come into their homes without a warrant. Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371 (1980). There is an exception to this Fourth Amendment protection where a person voluntarily gives consent for the officer to search. Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797 (1990). Here the government argues that Mr. Calderon-Fuentes voluntarily consented to the entry of law enforcement agents into his home, as well as to their questioning of him. However, Gary Chwast, a Homeland Security Investigator, and Chuck Arbogast, an investigator with the Veterans Administration, came to Mr. Calderon-Fuentes's home pretending they were both Homeland Security Investigators. They told Mr. Calderon-Fuentes they were there for national security reasons to inquire about his foreign national contacts. This was not true. The Officers were there to investigate information that Mr. Calderon-Fuentes was fraudulently receiving benefits for his blindness.

17

Prior to Spivey, our Circuit precedent said that searches are not generally reasonable where agents induce consent by "deceit, trickery or misrepresentation." United States v. Tweel, 559 F.2d 297, 299 (5th Cir. 1977). A later case applying Tweel explained, "[w]hen a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations." SEC v. ESM Gov't Ser., Inc., 645 F.2d 310, 316 (5th Cir. Unit B May 18, 1981). Our predecessor court deemed it "clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray his trust." Id.

The Majority Opinion here, like the Majority in Spivey, attempts to get out from under Tweel by saying our Circuit had "never applied Tweel outside the administrative context." Yet ESM interpreted Tweel's rule as applying to "government agents," not just agents working in the administrative context. See id. The key to Tweel's holding was that a government agent may not secure consent to search by misrepresenting the nature or scope of his government authority. See ESM, 645 F.2d at 316 n.7 ("In Tweel and Stuart, as in the case at hand, the government agents were given access to records not available to the general public, just because they were government agents."); see also United States

18

v. Bosse, 898 F.2d 113, 115 (9th Cir. 1990) (relying on ESM as persuasive authority supporting the rule that consent is not voluntarily given "when a suspect is informed that the person seeking entry is a government agent but is misinformed as to the purpose for which the agent seeks entry").

Even if Tweel's rule is limited to the administrative context, applying it here hardly counts as a departure. In Tweel, the Internal Revenue Agent represented to Mr. Tweel that he was conducting a civil audit, as opposed to the actual criminal audit he was conducting. Here, Mr. Calderon-Fuentes was confronted by an investigator from the VA, pretending to be a Homeland Security employee who was seeking security-related information about Mr. Calderon-Fuentes's foreign travel. On my review of the record, it is not clear Mr. Calderon-Fuentes's was told the agents suspect him of criminal conduct. Thus, this seems to me a circumstance where Tweel, not Spivy applies. See Spivy, 861 F.3d at 1213 (suggesting Tweel did not apply because the "suspect [wa]s aware of the criminal nature of the investigation").

Our predecessor court gave relief to Mr. Tweel by suppressing the search resulting from the IRS's agent's misrepresentation. I understand our Circuit's prior panel precedent rule to require us to use the same standard here. See Smith v. GTE Corp., 236 F.3d 1292, 1299 n.8 (11th Cir. 2001) ("[T]he holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent

panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court."). In light of the deception of the agents here, I would grant Mr. Calderon-Fuentes's motion to suppress. I respectfully dissent.